## Staunton.

### STEVE WOODS AND JOHN HATFIELD V. COMMONWEALTH.

#### September 18, 1924.

1. HOMICIDE—*Indictment and Information—Failure to Allege that the Deceased was a Human Being.*—In the instant case, the indictment charged the defendants with striking, cutting and wounding one E. M. with an axe and giving to *him* mortal wounds, and that the said defendants, *him* the said E. M. did kill and *murder.*

    *Held:* That the indictment was not fatally defective in that it did not charge specifically that E. M. was a human being. A casual reading of the italicized language in the indictment, in connection with the repeated reference to E. M., clearly demonstrates that the subject furnishing the *corpus delicti* was a human being of the masculine persuasion.

2. WORDS AND PHRASES—*"He"—"Him."*—Webster, in his dictionary of the English language, defines the word "he," (1) "A pronoun, a substitute for the third person, masculine gender, representing the man or male person named before. "Him" is defined as "the objective case of he."

3. HOMICIDE—*Murder—Definition.*—"Murder is the unlawful killing of any person in being under the protection of the Commonwealth with malice aforethought."

4. HOMICIDE—*Indictment—Failure to Charge the Specific Time of the Commission of the Crime.*—In the instant case, a prosecution for murder, it was objected that the indictment was fatally defective in that it failed to charge the specific time of the commission of the crime and that owing to changes in the law pertaining to murder in the first degree, time was of the essence of the offense. (Code of 1887, section 3663, Acts of 1914, chapter 240, Code of 1919, section 4394.)

    *Held:* That there was no error in the action of the court in overruling a motion in arrest of judgment on this ground.

5. HOMICIDE—*Murder in the First Degree—Changing Law.*—The same elements that constituted murder in the first degree, under the Code of 1887, constitute murder in the first degree under the Code of 1919. There has been no change in the elements constituting the crime of murder, the only changes bearing on the subject relate to the degrees of punishment.

6. NEW TRIAL—*Appeal and Error—Criminal Law—Verdict Contrary to the Evidence—Evidence but Facts not Certified.*—In a case entirely of circumstantial evidence where the facts proved are not certified by the trial court, but the bills of exceptions contain a certificate of the evidence only, the Supreme Court of Appeals can only consider the evidence offered by the Commonwealth and will not grant a new trial unless after rejecting all the parol evidence for the exceptor, and giving full faith and credit to that of the adverse party, the decision of the court below still appears to be wrong. In other words, the appellate court in considering the case must discard all the evidence introduced by the prisoner, and admitting the truth of the Commonwealth's evidence, the inquiry always is: Is the verdict contrary to the *evidence?* And if the case be one entirely of circumstantial evidence, the further inquiry is: Are the circumstances given in evidence of such a character and tendency as to produce upon a fair and unprejudiced mind a moral conviction of the guilt of the accused beyond all reasonable doubt?

7. CRIMINAL LAW—*Presumption and Burden of Proof—Innocence—Reasonable Doubt.*—Whenever a citizen of this Commonwealth is arraigned upon an indictment charging him with the commission of a crime, he stands secure in that presumption of innocence with which the law invests him. The Commonwealth, whose duty it is to protect the innocent as well as to punish the guilty, must bear the never-shifting burden of proving the guilt of the accused to the exclusion of every reasonable doubt. Until this is done the sovereign State is not justified in taking from her citizen, be he high or low, life or liberty.

8. HOMICIDE—*Murder—Evidence Held Insufficient to Sustain Conviction.*—In the instant case, a prosecution for murder, there was no evidence that defendants had any motive for committing the crime or, at best, evidence of a very slight motive. There was evidence that deceased and defendants were friends and on the other hand it was proven that another had threatened to kill deceased. There was evidence that such other had a motive to rid himself of deceased and there was evidence that since the murder this other had fled the country.

   *Held:* That while there was some suspicious circumstances pointing to the guilt of the accused the Supreme Court of Appeals did not feel that it was called upon to sustain even so solemn an act as the verdict of a jury, where that verdict is based not upon proof, but upon suspicion.

9. CRIMINAL LAW—*Proof Necessary to Sustain a Verdict of Conviction—Circumstances of Suspicion Alone.*—Circumstances of suspicion, no matter how grave or strong, are not proof of guilt, and the accused must be found not guilty unless the fact of his guilt is proven beyond every reasonable doubt to the actual exclusion of every reasonable hypothesis of his innocence consistene with the fact proven.

Error to a judgment of the Circuit Court of Dickenson county.

*Reversed.*

The opinion states the case.

*S. H. & George C. Sutherland* and *J. M. Hooker*, for the plaintiffs in error.

*John R. Saunders, Attorney-General, Leon M. Bazile, Assistant Attorney-General,* and *Lewis H. Machen, Assistant Attorney-General,* for the Commonwealth.

CAMPBELL, J., delivered the opinion of the court.

The accused, Steve Woods and John Hatfield, on the 25th day of September, 1923, were indicted for the murder of Ervin Mullins. Upon their trial by a jury they were found guilty of murder in the first degree and their punishment fixed at confinement in the penitentiary for life. Upon this finding of the jury, judgment was entered by the trial court. To that judgment this writ of error was awarded.

The action of the court in overruling the demurrer to the indictment is assigned as error.

[1-3] The ground of demurrer is that the indictment does not charge specifically that Ervin Mullins was a human being.

The indictment is in the usual form employed in this Commonwealth, and alleges that John Hatfield and Steve Woods on the........... day of ----------------------------, in the year ........, in the said county, did unlawfully, maliciously and feloniously and of their malice aforethought, with a certain axe, club, rock and other hard substances and weapons did strike, cut and wound *one*

Ervin Mullins, in and upon the head, back, arms, face, neck and sides, giving to *him*, the said Ervin Mullins, with said axe   *   *   *   etc., mortal wounds, of which mortal wounds *he* then and there died.

"And the jurors, aforesaid, upon their oaths aforesaid, do further say that the said John Hatfield and Steve Woods, *him* the said Ervin Mullins   *   *   * did kill and *murder* against the peace and dignity of the Commonwealth."   .(Italics added.)

Counsel for the accused, in apparent seriousness, in the petition for a writ of error, propound the following:

"Now who was Ervin Mullins or what was he? There is nothing to show what he was, whether he (or it) was a cat, a horse, or some other animal, or an unborn child."

Webster, in his dictionary of the English language, defines the word "he," (1) "A pronoun, a substitute for the third person, masculine gender, representing the man or male person named before."   "Him" is defined as "the objective case of he."

Professor Minor in his Synopsis of the Law of Crimes and Punishments, page 52, gives the following definition of murder:   "Murder is the unlawful killing of any person in being under the protection of the Commonwealth with malice aforethought."

In our consideration of this assignment, we think a casual reading of the italicized language in the indictment, *supra*, in connection with the repeated reference to Ervin Mullins, clearly demonstrates that the subject furnishing the *corpus delicti* is a human being, of the masculine persuasion.

Though the question presented is one of first impression in this Commonwealth, we are relieved by the decisions of other States of the Union—of the burden of exploring the whole realm of the animal kingdom in

order to negative the suggested idea that Ervin Mullins is an animal.

In *Palmer* v. *People*, 138 Ill. 356, 28 N. E. 130, 32 Am. St. Rep. 146, it was urged that the trial court committed error in refusing to quash the second count of the indictment because it failed to charge that George Bopp, alleged to have been killed by the defendant, was a human being. It was argued that this allegation was necessary, because section 140 of the Criminal Code of Illinois defined murder to be "the unlawful killing of a *human being* in the peace of the people, with malice aforethought, either express or implied."

In passing upon this assignment of error the court said: "It need not be averred that the deceased was a human being. The name imports a human being. The language of the indictment, and the name applied to the deceased, are always used to describe human beings. (*Merrick* v. *State*, 63 Ind. 327; 9 Am. and Eng. Ency. of Law, page 638, and cases referred to in Note 9.)"

In *State* v. *Stanley*, 33 Iowa 526, the court, in passing upon a similar assignment as the one under consideration, said (pages 530, 531): "Counsel claims that the indictment, following the words of the statute (section 4191), should have alleged that the deceased was a human being. This has never been held necessary. The language of the indictment, and the name applied to the deceased are always used to describe men, human beings. It will be presumed that the indictment is understood according to the import of the common language used therein."

In *Wade* v. *State*, 23 Tex. App. 308, 4 S. W. 896, the indictment charged that the accused murdered one "Smutty My Darling." He was convicted and the death penalty imposed upon him. The accused demurred to the indictment, and also moved in arrest of

judgment. The court, in sustaining the contention of the State that such an allegation is unnecessary, said: "It was not error to overrule the exception to the indictment and the motion in arrest of judgment, both based upon the supposed insufficiency of the indictment in that 'it does not appear from the face of the indictment whether the defendant killed a man, or a beast, or some inanimate object.' It is alleged in the indictment that the defendant killed 'Smutty My Darling.' It has been repeatedly held by this court that in an indictment for murder it is sufficient to allege the name of the deceased, without further alleging that said deceased was 'a reasonable creature in being.' (*Bean* v. *The State*, 17 Texas Cr. App. 60, and cases there cited.) Whether or not the deceased was 'a reasonable creature in being,' and, therefore, the subject of unlawful homicide, is a question not of pleading, but of proof. If the name of the deceased, as alleged in the indictment, was the name of a human being, and it was this identical human being that was killed, it can make no difference that the name is an unusual one—a name perhaps never before applied to a person. The singularity of the name would serve the more certainly to identify the deceased. In all respects the indictment is in accordance with long approved precedent, and is sufficient."

In *Reed* v. *State*, 16 Ark. 501, the indictment charged the defendant with the killing "of a certain Wyandott indian, whose name is unknown to the grand jury," etc. The court, in overruling the contention of the accused, said: "It is not alleged in any indictment, in terms, that the party slain is a human being. This is to be inferred from the character of the accusation and the descriptive language employed in the tenor of the indictment.

"It would hardly be going too far to say that the court judicially knows that a Wyandott indian is a human being, and especially when it is alleged that he was in the peace of the State, and was murdered.  1 Greenleaf's Ev. sections 4, 5, 6.  If there could be any serious doubt of this, the verdict, upon the plea of not guilty, would cure the defect, as the court below would hardly have received from the jury a verdict of man-slaughter, unless it had been proven upon the trial that the deceased was a human being.  The learned counsel could hardly have been serious in urging that the word indian might have referred to a river, which he says bears that name.  It would be a glaring want of judi-cial knowledge, in any court, to suppose that a man was indicted for the murder of a river, or that a jury would return a verdict of manslaughter in such case.  * *"

In disposing of this assignment of error, we have no difficulty in arriving at the conclusion that there is no merit in the same, and that the action of the trial court in overruling the demurrer was plainly right.

[4] The second assignment of error calls in question the action of the trial court in overruling the motion in arrest of judgment.  This motion is urged on the ground that the indictment is fatally defective for the reason that it charged that the accused did "on the _____ day of _____, in the year _____, in said county," etc., murder Ervin Mullins, instead of charging the specific time of the commission of the crime; that time is of the essence of the offense and should be stated.

The Code of 1887 (section 3663) prescribed the death penalty for murder in the first degree; the General Assembly, in 1914 (chapter 240), passed an act authorizing the jury, in its discretion, to punish murder in the first degree with either death or confinement in the penitentiary for life; the Code of 1919, which took

effect January 13, 1920, by section 4394, prescribes that murder in the first degree may be punished either with death, or confinement in the penitentiary for life, or for a term not less than twenty years.

This, it is urged by counsel, constitutes such recent changes in the law pertaining to murder in the first degree, as to necessitate the charging of the exact time of the commission of the offense so that the court may properly instruct the jury as to the degree of punishment.

There is no error in the action of the trial court in overruling the motion in arrest of judgment. Section 4875 of the Code of 1919 provides that no indictment shall be quashed or deemed invalid for omitting to state, or stating imperfectly, the time at which the offense was committed, when time is not of the essence of the offense.

[5] The same elements that constituted murder in the first degree, under the Code of 1887, constitute murder in the first degree under the Code of 1919. There has been no change in the elements constituting the crime of murder, the only changes bearing on the subject relate to the degrees of punishment.

A similar assignment has been fully dealt with by this court and decided contrary to the contention of the accused.

In the case of *Puckett* v. *Commonwealth,* 134 Va. 583, 113 S. E. 855, Sims, J. (now president of the court), in delivering the opinion of the court, said:

"We need not stop here to inquire whether a subsequent statute falls within said principle and holding, where, although it changes the punishment, it does not require a certain penalty fixed by the statute to be imposed without discretion by the judgment of the court, but leaves the punishment to be fixed by the

jury within certain limits mentioned, so that the rights of the accused may be protected by the instructions given by the court, or the charge delivered by the clerk under our practice, as to the statute applicable to the case. A more far-reaching distinction now to be made concerning the present procedure in this jurisdiction renders that subject immaterial.

"The decisions in Virginia, applying the principle referred to and holding that the defect in the indictment mentioned is fatal, even if objected to only by motion in arrest of judgment, were prior to the recent change in our statute law made by section 4877 of the Code of 1919; and essentially and fundamentally, the reason for the holding that such defect could be taken advantage of at any stage of the trial, and by motion in arrest of judgment, was this: The law, as it then stood, provided no means by which the indictment could be amended after its return by the grand jury, so as to satisfy the constitutional provision giving the accused in all criminal prosecutions 'the right to demand the cause and nature of his accusation.' (Constitution, section 8.) The defect was, therefore, fatal to the validity of the indictment on demurrer, . because, as the law then stood, the indictment could not be amended. For the same reason, as the law then stood, the defect was fatal to the validity of the indictment on motion in arrest of judgment. As said in 16 C. J. 1258: '* * the court will determine the validity. of objections on a motion in arrest (of judgment) by ascertaining whether they would have prevailed on demurrer, and * * * whatever would be fatal under the latter would be fatal under a motion in arrest * * .' Conversely, it must be true that when the law has been so changed that such a defect as that under consideration may be cured by amendment of the in-

dictment by the court, so that the defect is not fatal to the indictment or demurrer thereto, motion in arrest of judgment will not lie for such defect.

"It is, of course, still true that where time is of the essence of the offense, the time must be alleged in the indictment, if the accused demands it before he pleads, but, under the aforesaid recent statute, this may be done by amendment of the indictment by the court. Section 4877 of the Code of 1919, in force when the instant case was tried, provides as follows: 'At any time before the defendant pleads, a defective indictment for treason or felony may be amended by the court before which the trial is had that does not change the character of the offense charged.  *  *  .'  It appears from the revisors' note to this section that it was intended to and, by fair construction, we think it does authorize, before the general issue is pleaded, any amendment of the indictment which does not change the nature of the offense charged.  Thus the accused is given timely and ample opportunity to avail himself of his constitutional right aforesaid to be informed of the nature and cause of the accusation against him.  That satisfies such constitutional requirement.  If he does not exercise this right when he should, in conformity with the reasonable and orderly procedure provided by the statute, namely, 'before he pleads'—meaning before he pleads putting himself upon his trial on the merits— he must be taken to have waived such right and, under the procedure put in force by the statute under consideration, it is too late for him afterwards to claim such right by motion in arrest of judgment.  See *Flanary's Case,* 133 Va. 655, 112 S. E. 604."

The necessity for the appellate court to pass upon an assignment of error of the character just disposed of will never arise if the atorneys for the Commonwealth

will only be diligent in the inspection of the indictments before they are handed to the grand jury and see that the essential dates are inserted.

There are twenty other assignments of error, based upon the alleged giving of erroneous instructions; refusing proper instructions; admitting and refusing to admit certain evidence; the uncertainty of the verdict; the rendition of judgment on the verdict, etc.

We do not deem it necessary to pass upon these assignments, as, in our opinion, the question raised by the ninth assignment of error is determinative of all the issues involved in this case.

This assignment of error is as follows: "Because the verdict is without sufficient evidence to support it."

[6] This is a case entirely of circumstantial evidence. In such a case as this, where the facts proved are not certified by the trial court, but the bills of exceptions contain a certificate of the evidence only, this court can only consider the evidence offered by the Commonwealth and will not grant a new trial unless "after rejecting all the parol evidence for the exceptor, and giving full faith and credit to that of the adverse party, the decision of the court below still appears to be wrong. * * * In other words, the appellate court, in considering the case, must discard all the evidence introduced by the prisoner, and admitting the truth of the Commonwealth's evidence, the inquiry always is: Is the verdict contrary to the *evidence?* Is that evidence (admitted to be true) insufficient to warrant the verdict of the jury? And if the case be one entirely of circumstantial evidence, the further inquiry is: Are the circumstances given in evidence of such a character and tendency as to produce upon a fair and unprejudiced mind a moral conviction of the guilt of the accused beyond all reasonable doubt?" *Dean's Case*, 32 Gratt. (73 Va.) 916.

[7] Whenever a citizen of this Commonwealth is arraigned upon an indictment charging him with the commission of a crime, he stands secure in that presumption of innocence with which the law invests him. The Commonwealth, whose duty it is to protect the innocent as well as to punish the guilty, must bear the never shifting burden of proving the guilt of the accused to the exclusion of every reasonable doubt. Until this is done the sovereign State is not justified in taking from her citizen, be he high or low, life or liberty.

[8] In this case it is disclosed that the accused, Steve Woods and John Hatfield, were represented in the court below and in this court by counsel assigned by the trial judge to defend them, because of their inability to employ attorneys by reason of their poverty.

The testimony and circumstances relied upon to convict the accused may be thus stated:

In September, 1923, the body of Ervin Mullins was found floating in the river, near Steinman, in Dickenson county. A coroner's inquest was held and Dr. A. W. Martin, who examined the body, testified that in his opinion Mullins had been dead for some time when the body was discovered; that from an examination of the lungs life was extinct when the body was cast into the water (if it was so cast); that a contused or lacerated wound was found over the left eye, also a wound on top of the head which penetrated to the skull; that the skull was fractured; there was dried blood on the left side of the face and in the left ear and fresh blood coming from the wound over the eye, from the nose and from the top of the head; that the shoes worn by the deceased contained dirt, the mouth was free from dirt, and in his opinion the wound over the eye was sufficient to produce death.

It was shown by the wife of Mullins that he left home Sunday, and by a witness, Dean, that he found the body floating in the river on Tuesday.

C. A. Long, a policeman at Moss, Va., testified that he was called to Steinman soon after the body was found; that he saw the shoes and clothes removed from the body; that in his efforts to obtain a clue as to the perpetrator of the deed he examined the territory adjacent to the place where the body was found; that about two o'clock Wednesday he went to the home of Steve Woods; that Woods told him that Mullins had been to his house on Sunday morning looking for a hound pup; that Woods told him that on Sunday night he and John Hatfield were operating a moonshine still; that Mullins was at the still and remained there until about nine o'clock; that he saw tracks at the still and leading from the still which were made by a person wearing "hob nailed" shoes; that Woods was wearing "hob nailed" shoes which looked to be the same size as the size of the tracks; that he found near a sink hole in a road leading from the still a place which looked like something had been laid there; that the leaves were padded down tight; that the next morning he found a trail leading from the cliff of the river above where the body was found; that lying off of this trail he found a hat; in examining two laurels it looked like something had knocked the leaves off of the bushes; that he went back to the still and came back over the ground to where the cliff went over and there he found some red looking wool and some lint, also found some lint or wool in a tree lap thirty or forty feet from the cliff; that off from this trail about eight feet he found a carbide lamp; that on each side of this trail he found tracks; that some of the tracks were made by "hob nailed" shoes; that he found signs on some rocks which looked like they had been made by "hob

nailed" shoes; that at the place where the lamp was found he found some blood on a rock; that he found other places along the trail that looked to be blood; that the trail had the appearance of something having been dragged along it; that he took Hatfield in charge, and that Hatfield told him Mullins was at the still on Sunday and Sunday night, had borrowed a carbide lamp from Woods; that the last time he saw him he was about thirty yards from the still and saw the lamp blown out; that Woods had found Mullins' pup and had it tied in his house.

L. Watson, a justice of the peace, testified that he made an inspection of the ground, in company with Long, the policeman. In answer to the question, "tell what you found?" he stated: "We went up to the cliff and come around and Mr. Long says here is the trail, looked like you had drug a hog, and I went out to where Wiley was and it looked to me like where you had killed a hog and drug him down the hill and went down the hill to see where it went and they pulled him over the first cliff and his hat lay about four feet to the left up the river, and we hunted for his lamp and we could not find it, and his hat was crumpled up and we come on down, then to the lower end of the sign above the cliff; there was no sign we could see and we searched to see and there was *them* men's tracks you could see them plain, one went on one side and one went on the other, it looked like they picked him up and swung him over the laurel, it is so thick they could hardly get through." Watson also stated he saw signs on the rocks and laurel.

Rufus Hill made a similar statement.

Wiley Dean testified that he had a conversation with John Hatfield, in which Hatfield told about Mullins being at the still. During this conversation, Dean further testified, "I took a black jack out and held it up and

asked if he knowed what it was and he pulled out a forty-five Colts out of his overalls, and he said there is something better, and we were standing out by the side of the house and Hatfield said I blame Ervin with the whole thing, and I never said anything for a minute and he said he ruined one still for us and he said he did something or other that caused the still to 'puke' and the rest they talked about making liquor." He also testified that Hatfield said Mullins left the still about nine o'clock "and it might be had fell over the cliff and killed himself."

On the part of the prisoners it was proved that a Mrs. Turner requested Woods to kill Mullins' pup which was thought to be mad; that instead of killing it he took it home for the purpose of delivering it to Mullins; and that Mullins and Wood and Hatfield were friends and there had never been any difficulty between them.

It was further proved by Fred Raines, a justice of the peace, that about a week and a half or two weeks before the body of Mullins was found that he issued a warrant upon the complaint of Mullins against one Kenas Wright and his, Mullins', wife, charging them with adultery; that he also issued a warrant against Wright for an assault upon Mullins.

It was further proved by Oscar McCowan, a deputy sheriff, that a few days before the body was found he delivered a message to Mullins from Squire Raines to have the warrants executed or return them and pay for them. In reply Mullins said he didn't believe he would have the warrants executed, that Kenas Wright said if he had the warrants executed he would kill him.

That Wright was at Steinman, the place where the body of Mullins was found, on Sunday night and Monday prior to the finding of same on Tuesday; that Wright

left the vicinity on Monday and had not been seen since; that he had a warrant for Wright charging him with the murder of Mullins.

It was further proved by B. H. Duncan that there was no evidence of a body having been dragged down the hill leading to the river. As far as the record shows there is no evidence whatever that Woods or Hatfield had any motive for committing the crime, unless the statement of Hatfield that Mullins made the still "puke" and he blamed him for it all is to be taken as evidence of motive.

On the other hand there is the proven threat of Kenas Wright to kill Mullins, there is evidence of a prior difficulty and the all-impelling motive to rid himself of the obstacle which stood between him and the woman for whom he lusted. The fact that Wright has fled the country is most significant.

Both Woods and Hatfield testified, denying that they were implicated in the slaying of Mullins.

During the argument of this case in the appellate court, the shoes worn by Mullins at the time of his death were exhibited. Upon a close inspection of same we failed to discover any scratches, abrasions, or torn places, which would indicate they had been dragged over rough stones for a considerable distance.

In the case at bar, while there are some suspicious circumstances pointing to the guilt of the accused, we feel that we are not called upon to sustain even so solemn an act as the verdict of a jury, where that verdict is based not upon proof, but upon suspicion.

[9] This was said in *Henderson's Case*, 98 Va. 798, 34 S. E. 881: "The court further instructs the jury that circumstances of suspicion, no matter how grave or strong, are not proof of guilt, and that the accused must be found not guilty unless the fact of his guilt is proven

beyond every reasonable doubt to the actual exclusion of every reasonable hypothesis of his innocence consistent with the fact proven."

Being of the opinion that the evidence is insufficient to warrant the verdict of guilty, the judgment of the trial court sentencing the accused, Steve Woods and John Hatfield, to the penitentiary for life, will be reversed, and the case remanded, to be disposed of according to law.

*Reversed.*