# Staunton

## HILLMAN TESTER v. COMMONWEALTH.

September 17, 1931.

Present, Campbell, Holt, Epes, Hudgins and Gregory, JJ.

The opinion states the case.

*Earle P. Rose* and *C. R. McCoy,* for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General,* for the Commonwealth.

GREGORY, J., delivered the opinion of the court.

On July 9, 1930, a number of officers went to the home of Thomps Dotson for the purpose of arresting him upon a warrant. The accused was at the home of Dotson when the officers arrived and promiscuous shooting followed with the result that Thomps Dotson and Hyson Baker, a constable, were killed, and Howard Justus, a deputy sheriff, David Smith, a deputized person and the accused, Hillman Tester, were wounded.

The accused was indicted for murdering Hyson Baker. He was also indicted for shooting Howard Justus with intent to maim, disable and kill and for shooting David Smith with like intent. The three indictments were found on July 29th and the accused was tried upon them on the 7th day of August. Upon the motion of counsel for the accused, and by consent of the Commonwealth, the trial of the three charges were heard together and before the same jury. The accused was found guilty upon each of the three indictments and his punishment under the murder indictment fixed at ten years in the penitentiary. His punishment under the indictment for shooting Howard Justus was fixed at four years in the penitentiary and for shooting David Smith he was given three years in the penitentiary.

There are a number of assignments of error, but in our view of the case it is only necessary to discuss the first one, which is that the verdicts are contrary to the law and the evidence and without evidence to support them.

In the morning, on July 9th, the three officers heretofore mentioned and others, including a justice of the peace, went up Paw Paw creek in Buchanan county, on a raid for distilleries. On a branch that flows into Paw Paw creek lived Thomps Dotson, who was the principal actor in the tragedy which will be narrated. The officers found a still near his home, and he not being found there they arrested his wife, Minda Dotson. She was taken down the creek to a point where officer Baker and the justice of the peace were stationed and promptly released on bail by the justice of the peace. Her husband, Thomps Dotson, was drunk and came by the home of the accused very much enraged on account of the arrest of his wife. He left there and started to the point where officer Baker and the justice of the peace were waiting. The accused and his brother Ballard thought that he would cause trouble, if he found the officers, and they got into their car and followed Thomps with the intention of overtaking him and preventing a difficulty between Thomps and the officers. Thomps in the meantime had obtained a rifle from the home of another neighbor. He got into the car with the accused and his brother Ballard, upon their request, and as he was being driven across the creek to avoid the officers, Thomps fired upon them with his pistol. The accused had previously "locked" the rifle which Thomps had procured in such a way that it could not be fired and for this reason it was not used. They proceeded up the creek and Thomps tried to obtain another rifle. All of the officers had by this time gathered at the point where officer Baker was stationed. When Thomps got out of the car at the home of Charles Dotson he dropped his pistol and the accused picked it up in order to prevent Thomps shooting at the officers again. Thomps, however, insisted upon having trouble with the officers on account of the arrest of his wife and he went near the point where they were to shoot them. The accused and others followed

him in the car. The accused continuing his efforts to avoid trouble had a talk with officer Baker. He tried to persuade Baker to wait until Thomps was sober before he arrested him. He told Baker if he would return the next day Thomps would be sober and would willingly submit to the arrest. Jack Spencer, a member of the officer's party and a witness for the Commonwealth, related what the accused said to officer Baker at that time. The accused, according to Spencer, said to Baker; "Mr. Baker let me beg to you for God's sake, and he said Thomps Dotson is in that car and he is drunk and we can't do anything with him and when he gets sober he will come in, or come in and give up or just anybody can arrest him." Baker's reply to the accused, according to Spencer, was: "Hyson Baker said he would arrest him or kill him." While this conversation was taking place Thomps presented the high powered rifle on the officers and again tried to shoot them, but he did not succeed because the rifle had been "locked" by the accused. The officers proceeded down the road a short distance and a shot was fired. The pistol which the accused had picked up when it fell from Thomps some time before had one shell in it which had not been fired and according to the accused's testimony he fired it into the ground, because "I was not aiming to let him (Thomps) have the gun with the shell in it." The officers returned and the accused went into the woods and failed to halt, though the officers had commanded him to do so.

The officers then returned to Grundy with one or two prisoners and while there Baker swore out warrants for Thomps and the accused. In the warrant the accused was charged with shooting at the officers when he fired the pistol as above stated, but this warrant was not produced at the trial and no satisfactory explanation was given for the failure to produce it. In the afternoon of the same day these officers, who were joined by other officers, after ob-

taining high powered rifles, returned to Paw Paw creek to arrest Thomps and the accused. In the meantime the accused, from the uncontradicted testimony, spent considerable time trying to pacify Thomps. He tried to induce him to give himself up to the officers. At the request of Minda, Thomps' wife, the accused and his mother went to the home of Thomps and after they arrived there the accused continued his efforts to prevent trouble, but as time passed Thomps became more infuriated and uncontrollable. Up to this time the evidence conclusively shows that the accused had spent most of the day trying to avoid trouble between the officers and Thomps. It further shows that the accused and Baker and others of his party were on friendly terms and that Baker had accepted invitations to have meals with the accused. In the brief of the Attorney-General this is stated: "We openly admit that the record does not show the accused to have borne any ill will toward Hyson Baker."

When the officers approached the home of Thomps, he, his wife Minda, the accused and his mother Julia Tester were in the yard. Thomps, upon the approach of the officers drew his pistol, which had been returned to him by the accused, started towards the fence and pointed it at the officers but did not shoot at them. He and the accused and the two women went into the house. The officers at this time called to Thomps and the accused, stating that they had come to arrest them. The officers were armed with pistols and rifles and had these weapons in their hands. As the accused, Thomps and the women went into the house the officers, led by Baker, after commanding that the women leave the house, rapidly approached the front door and Baker entered the house. Howard Justus, one of the officers who was seriously wounded, said that he pressed right on to the door and as he went toward the door he saw officer Baker and the accused in a scuffle on the bed. When

asked if he saw the accused with a pistol, he said he saw a pistol but thought that officer Baker had it. He was not positive whether the accused had a pistol but said that he thought the accused fired. When asked what Baker did he said that Baker fired on Thomps and Thomps fired on Baker. He then said that the accused had "his gun on me and I was shot right there," but he did not state that the accused shot him. He later said that "I believe Tester shot first." Again he said, "and to the best of my knowledge it was Hillman Tester, he threw the gun on me * * *." Again he said, "after he shot Baker he shot me," but his evidence shows that he was shot first and had escaped from the house before Baker was killed. This testimony of Howard Justus is strongly relied upon by the Commonwealth to sustain the verdicts. At one time Justus says that the accused did not have a gun and almost immediately afterwards he says that he did have one and was using it.

Justus was asked this direct question: "Who was it shot you there?" And he answered "to the best of my recollection it was Hillman Tester, he threw the gun on me and I stopped and I was shot again." Justus was an eye witness to the shooting. He was just on the inside of the door within a few feet of the accused and Thomps and yet was unwilling to state positively that the accused shot him. He simply states that "to the best of my recollection it was Hillman Tester." It is inconceivable that he could have been so near the accused and looking at him while the shooting was going on and still be unable to state positively that the accused shot him. It would be almost impossible for him, under such circumstances, to be indefinite and uncertain on such a vital point.

As an illustration of the contradictory nature of the testimony of Justus, he at first stated that he did not think the accused had a gun or pistol when he stopped inside the door and saw the accused and Baker in a scuffle on the bed

and immediately afterwards he stated that the accused "had his gun on me." In the latter part of this statement he contradicts what he said in the former part and no one could know from his testimony that the accused had a gun or pistol and if he did have one, that it was fired by him.

Justus further testified that he did not see Smith during the shooting, therefore he did not know who shot Smith, the other officer who was wounded, and he does not claim to know. Smith does not testify that he saw or knew who shot Justus or who shot him (Smith).

Smith testified that he could not see what was going on in the house, as he was in the yard, and that he could not see through the door because Baker was in his line of vision. He said that he ran to a window and looked in and "these two boys was both shooting," and "I shot at one or the other of the boys." He did not know which one he shot at, though neither had his back to the witness. He further testified that "I seen one or the other of the men shooting Hyson (Baker) but I thought it was Thomps." In answer to this question, "then did you see Thomps shoot Hyson?" (Baker) he replied, "I thought I did." He then answered in reply to these questions as follows: "You say somebody shot at you?" "Yes, sir." "You didn't see the man did you?" "No, sir." This witness makes no direct or positive statement that Tester fired any of the shots which killed Baker, wounded Justus or himself.

After the battle, Baker was found outside of the house mortally wounded with a number of bullet wounds in his body. Justus was also found outside of the house seriously wounded, with two bullet wounds. Smith was shot through the leg on the outside of the house. Thomps was found dead inside the house with more than eight bullet wounds in his body. The accused was found immediately after the firing ceased under a bed lying on the floor. He had two slight wounds, one on the forehead and the other on

the hand. When he was found, immediately following the shooting which was over in less than two minutes, he was searched and the uncontradicted testimony is that he had no pistol or other weapon but was severely frightened. The uncontradicted testimony further shows that the only weapon found in the house immediately after the shooting was the pistol which Thomps had used.

█ The testimony of the Commonwealth is unsatisfactory and uncertain. It is apparent that a great number of shots were fired and there is strong intimation and inference that several of them were fired outside of the house by others than those mentioned. It clearly appears that Baker was killed by shots fired by Thomps. It is not clearly shown who shot Justus, or who shot Smith, but it could reasonably be inferred that Thomps shot Justus and that Smith was shot by someone outside of the house. It is clearly shown that the accused did not shoot either Baker or Smith.

In addition to the weakness and uncertainity of the testimony of Commonwealth's witnesses, Howard Justus and David Smith, on whose testimony the Commonwealth seeks to sustain the verdicts, twelve witnesses were introduced by the accused who testified that shortly after the shooting, while Justus was in the hospital and Smith was incapacitated from his wounds, that Justus and Smith told a number of them that Thomps and David Dotson killed Baker and wounded them. To others they stated that they did not know who killed Baker nor who shot them. To others Justus said David Smith shot him accidentally and to others he said that he and Smith were shot from the brush. Justus and Smith admitted that they had told some of these witnesses that they did not know who killed Baker or who shot them.

It is also shown beyond doubt that the accused had made every reasonable effort to prevent the shooting. He had

tried to persuade Baker to return the next day to arrest Thomps when he would be sober and would submit to the arrest. It is also clearly shown that the accused was on friendly terms with the officers and had no motive whatever to injure or shoot them.

The burden was upon the Commonwealth to prove beyond a reasonable doubt, (1) that the accused actually fired the shots which killed Baker and wounded Justus and Smith, or (2) that Thomps killed Baker and wounded Justus and Smith and that the accused aided and abetted Thomps in so doing.

The evidence is insufficient to show that the accused either killed Baker or wounded Justus and Smith. There is no evidence in the record to show that the accused was an aider and abetter. On the other hand, it is clearly shown that the accused and Thomps were not acting in pursuance of a common design to slay or wound the officers. It therefore follows that the verdicts are not supported by the evidence.

We are not unmindful of the rule which requires us to attach great weight to the verdict of a jury which has been approved by the trial court, yet, under section 6363 of the Code, it is the duty of this court to set aside the verdict of a jury and reverse the judgment of the trial court approving it, whenever it appears from the evidence that such judgment is plainly wrong or without evidence to support it. The verdicts in the cases now before us are plainly wrong and without sufficient evidence to support them.

In the case of *Warren* v. *Commonwealth*, 144 Va. 669, 131 S. E. 227, 228, the court reversed the judgment of the trial court on account of the insufficiency of the evidence and the opinion in that case concludes with this significant language:

"We recognize the importance of the prompt and efficient

enforcement of the criminal law of the State, and that a case should not be reversed by this court for mere formal errors if it is possible to avoid it, but the error here complained of is not merely formal. It goes to the very merits of the case, and a certain degree of proof is required before a man can be deprived of his life or his liberty, and this degree has not been furnished. The protection of the innocent is not less important than the punishment of the guilty. A 'waive of crime' cannot be stopped by the punishment of those of doubtful guilt. Mere suspicion, however strong, will not support a verdict of guilty. The burden is on the Commonwealth to prove the guilt of the accused beyond a reasonable doubt. *Woods* v. *Commonwealth*, 140 Va. 491, 124 S. E. 458; *Cox* v. *Commonwealth*, 140 Va. 513, 125 S. E. 139, and cases cited.

"In the instant case there are some circumstances of suspicion, but there is no satisfactory evidence of the guilt of the accused. Suspicion cannot be substituted for proof, nor supply the place of evidence necessary to overcome the presumption of innocence, and for this reason the judgment of the trial court must be reversed."

Our conclusion renders it unnecessary to pass upon the numerous exceptions to the rulings of the trial court.

The judgments of the trial court will be reversed, the verdicts of the jury set aside, and the cases remanded to the trial court with directions to discharge the accused from further prosecution under these indictments.

*Reversed.*