# Richmond

HARRY E. LaPRADE v. COMMONWEALTH OF VIRGINIA.

October 9, 1950.

Record No. 3719.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*J. Bradie Allman* and *Clyde H. Perdue*, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General*, and *Henry T. Wickham, Assistant Attorney General*, for the Commonwealth.

MILLER, J., delivered the opinion of the court.

Harry E. LaPrade was indicted under the provisions of section 4428, Code, 1942 (sec. 18-149, Code, 1950), for maliciously burning in the nighttime a stable containing livestock.

The trial was had before a jury and accused elected not to testify nor did he offer any witnesses in his behalf. The evidence against him was wholly circumstantial. He then contended and now asserts that it was insufficient to justify conviction. A verdict of guilty was, however, returned which fixed his punishment at three years confinement in the penitentiary. To a judgment entered thereon, this writ of error was awarded.

Petitioner relies upon two assignments of error:

(1) That the evidence is insufficient to sustain the verdict, and in that respect asserts that (a) it does not establish beyond a reasonable doubt that the fire was of incendiary origin, and (b) if so, then it is not proved that he was the guilty agent; and

(2) That improper and harmful testimony was admitted over his objection.

The errors assigned render it necessary to set out the salient facts and circumstances proved which are as follows:

On the night of March 25, 1949, between 9:00 and 9:30 o'clock, a building (interchangeably called a barn or stable) owned by J. C. Angle, containing hay and in which several head of livestock were housed, was destroyed by fire. The building was a total loss, and though some of the stock escaped, four head of cattle and one horse were killed. There had been rain a day or two before the fire and the night was damp and foggy. The owner, assisted by his two children, had attended to the usual chores at the barn and departed therefrom between sunset and dark. He does not smoke and was the last of these three in the building. There was no electric or delco system servicing the barn, nor was there any combustible material such as oil,

gas or explosives kept in or about the structure. The home of Houston Angle, a son of the owner, is about two hundred yards from the barn. That night he looked at a clock in the window of his residence at 9:15 p. m., and in so doing, faced directly towards the stable, but saw no evidence of fire. However, two or three minutes later when he again looked in that direction, the flames had engulfed the building and "it looked like the whole earth was lit up." He ran from his home toward the stable but when he arrived, the fire was so intense that it was unsafe to go nearer than fifty feet of the building. At that time the barn "was burning all over, fire running out of the roof, sides, eaves, everywhere," and the "floor under the shed was falling in * * * "

When about half way from his home to the conflagration, Houston Angle thought he smelled the odor of gasoline. However, when he thought he sensed that odor, he was about as close to his parked automobile as he was to the burning barn, and upon arriving at the fire, he noticed no such odor. J. C. Angle's residence is also nearby and as Houston Angle ran towards the fire, he called and notified his father, who, in a minute or two, followed him to the scene.

At the stable, the owner and his son saw human footprints in the mud. These tracks disclosed that someone whose feet were clad only in socks had approached, entered and departed from the barn. The imprints were distinctly visible in soft red mud around the barn, which contained small particles of isinglass.

Upon ascertaining that they could do nothing to free the stock or stop the fire, J. C. Angle and his son drove to Rocky Mount to notify R. C. Ramsey, sheriff of Franklin county. When the two returned some thirty minutes later, they recognized accused's truck parked on the edge of the public road just opposite the road leading to the barn and within sight of the burning building. They did not ascertain whether or not the truck was occupied, but when the

sheriff and his deputy arrived about five minutes later and noticed the truck, they saw that it was occupied by Harry E. LaPrade and his cousin, a boy named Eunice Lynch. They stopped and talked a moment with the occupants and asked if they had been to the fire, to which inquiry accused replied that "they had not." The sheriff and his deputy observed that accused was then intoxicated. They proceeded on a short distance to the scene of the fire, and after being there a few minutes and observing the footprints in the mud, they heard the LaPrade truck drive off. It proceeded along the public highway and turned into accused's home, which is situated across that road from the barn. The sheriff and his deputy thereupon ceased for the time being their investigation at the barn and went to LaPrade's home, where they found him still seated in his truck and much under the influence of intoxicants. Accused was wearing shoes which he was requested to remove, and after some slight hesitation, complied. It was then ascertained that he wore no socks and red mud was on his feet, between his toes and in his shoes, which mud contained particles of isinglass. He was asked where his socks were and replied that "he didn't have none." He was again asked if he had been to the barn and said, "No, sir, I haven't been there."

About twelve or fifteen sock clad foot tracks were distinctly visible at, about and entering the barn, and some forty or fifty less distinct tracks led away from the barn. Still further along, there were some marks of mud on the grass, leaves and rocks. The sheriff gives this description of the tracks at and near the premises:

"I saw those tracks leading into the barn—barefooted. * * * The tracks come out of the barn and turned right up the road like a man was staggering, the tracks weaved that away, stepped in a deep ditch, a rut that deep you might say, of mud where automobiles had been, then he staggered out, one foot on the bank, and one in the road, kept on up the road a ways and turned out to the left up a bank over

some rocks. We tracked him on up through there that night by the mud on his feet."

The sock clad footprints near and about the barn appeared to be those of a man wearing about a seven or eight size shoe. They were sufficiently visible as they led away from the scene to be followed for some distance and to the woods. From there the tracks were indistinct but the pedestrian's course could be traced by particles of mud left on leaves and stones until it reached an old road. From there some rather indistinct tracks appeared but they disclosed that the maker there wore shoes. This course could be, however, followed with difficulty along a graveled road to within forty or fifty steps of LaPrade's home where "it gave out."

The next morning a further investigation was made and the sheriff went again to LaPrade's home. He asked accused where the shoes were that he had worn the night before and accused replied that the shoes that he was then wearing were the same that he had worn the previous night. However, defendant's cousin, Eunice Lynch, then in the presence of defendant contradicted that statement and said that the shoes then worn by defendant belonged to him (Lynch) and he had loaned them to defendant, whereupon accused answered no further inquiries concerning the shoes that he had worn the evening of the fire.

On the other hand, it appears that though a careful investigation and search were made around and about the scene the night of the fire, and the course of the tracks followed as best they could be by the aid of flashlights, and accused's home and premises examined, no muddy socks were located, nor was any container that might have held gasoline observed. The following morning a more thorough examination and search were made but no such articles were found. We therefore conclude that the mere thought on the part of Houston Angle that he smelled the odor of gasoline when some considerable distance from the barn

is of no probative value to establish that gasoline was an ingredient used by some incendiary to start the fire.

It should now be also stated that a rather cursory examination was made of the mud near and about accused's home and though some of it was of a somewhat different color from that about the barn, it contained particles of isinglass.

About a month after the fire, accused told the deputy sheriff that "the reason I didn't let you all have the shoes was my lawyer advised me not to." Yet it is rather obvious that accused had not enjoyed an opportunity to consult counsel between the night of the fire and the following morning when questions were propounded to him.

On the morning of March 26th when the sheriff called at the home of accused, he found his feet free of mud that had been noticed the previous night. Request was made that he go to the site of the barn and there he was asked to take off his shoes and put his bare foot into one or more of the then visible imprints. The sheriff says that accused somewhat reluctantly complied, but when he placed his foot in the first track, he did it in such a manner as to touch the side of the imprint and enlarge the track. He was then directed to try another print, which he did. The testimony is that his foot fit that track.

Two other tracks or imprints in the mud had been protected from destruction and plaster cast forms of these tracks were made. A plaster cast form of a barefoot track then voluntarily made by accused in the mud near the barn was also obtained. These forms, two made of tracks found around the barn and one made from the known track of accused, are rather crude but were introduced in evidence before the jury and are now before this court as exhibits. There is no marked similarity between the known track of accused and the two tracks preserved at the scene of the fire. Measurements reveal that the known track is both broader and longer than the other two. Careful examination of these casts also discloses that the second toe of the true track is shorter than the great toe but on the two forms

made from the tracks found in the mud on the night of the fire, the great toe is shorter than the second toe. Though the sheriff says his bare foot fit one track, that is somewhat a matter of opinion and the plaster casts physically before us materially question the correctness of that conclusion and tend to establish the fact that the tracks found about the scene of the fire were not those of accused.

The evidence further reveals that due to some previous difficulties which arose because of the depredation of stock owned by one of these men upon the lands of the other, ill feelings existed between these neighbors and they were not on speaking terms.

Over the objection of the accused, a witness was asked if she "had a conversation with Harry LaPrade some time ago with reference to his shoes." Her reply was, "Yes, sir, I did." Upon being then asked what the conversation was, she said, "He only said he burned them. I didn't ask him where and he didn't say where. Just said he burned them."

It also appears that Eunice Lynch resided in Roanoke, Virginia, but a summons issued at the instance of the Commonwealth for him to appear as a witness was returned, "Not being found * * *."

The foregoing recital contains all of the material circumstances relied upon to sustain the conviction.

Accused's assertion that improper evidence was admitted over his objection is predicated upon the contention that the testimony concerning his destruction of the shoe was inadmissible.

We have no difficulty in holding that the evidence offered that accused had burned his shoes at a time subsequent to the fire was admissible. When the shoes were examined on the night of the fire, mud, containing particles of isinglass and similar to that near the barn, was found therein, thus raising a justifiable inference that muddy feet had been thrust into these shoes. Added to that circumstance was the fact that LaPrade's feet were smeared with mud of similar character, thus indicating that his feet had

acquired the mud found thereon when he was barefooted and that they had then been thrust into the shoes. Though the isinglass-flecked mud in the shoes and on his feet would not furnish convincing proof of his presence at the barn, it does, however, disclose a probability of that fact and destruction of the shoes under such circumstances tends to show a guilty conscience. Such being true, the evidence was admissible.

The character and sufficiency of circumstantial evidence necessary to sustain a conviction have been often considered. Recently Justices Buchanan, Gregory and Spratley in *Smith* v. *Commonwealth*, 185 Va. 800, 40 S. E. (2d) 273, *Garner* v. *Commonwealth*, 186 Va. 600, 43 S. E. (2d) 911, and *Toler* v. *Commonwealth*, 188 Va. 774, 51 S. E. (2d) 210, respectively, have with care and clarity restated the principles governing its application and sufficiency. To attempt to do so again would be repetitious and fruitless. It suffices to say that if the proof relied upon by the Commonwealth is wholly circumstantial, as it here is, then to establish guilt beyond a reasonable doubt all necessary circumstances proved must be consistent with guilt and inconsistent with innocence. They must overcome the presumption of innocence and exclude all reasonable conclusions inconsistent with that of guilt. To accomplish that, the chain of necessary circumstances must be unbroken and the evidence as a whole must satisfy the guarded judgment that both the corpus delicti and the criminal agency of the accused have been proved to the exclusion of any other rational hypothesis and to a moral certainty. Yet what inferences are to be drawn from proved facts is within the province of the jury and not the court so long as the inferences are reasonable and justified.

In each of these cases relied on by accused—*Pryor* v. *Commonwealth*, 27 Gratt. (68 Va.) 1009, *Garner* v. *Commonwealth*, 2 Va. Dec. 458, 26 S. E. 507, and *Jones* v. *Commonwealth*, 103 Va. 1012, 49 S. E. 663, the three respective defendants were convicted in the trial courts of burning a

building. The primary proof against each to establish that the fire was of incendiary origin and the accused its author was the presence and evidence of tracks claimed to have been made by the defendant at and near the scene of the crime. The opinions in all three cases disclose the care with which the court scrutinized and considered the circumstantial evidence as it was weighed in each instance with a view of determining if the two vital issues, (a) the corpus delicti and (b) the criminal agency of the accused, had been established.

In the *Pryor Case, supra*, Judge Christian said that other than some evidence that ill-will existed between accused and the owner of the building that was destroyed by fire, the only circumstance in the case which tends to raise a suspicion against the accused is that a track was found on the morning after the barn had burned, which Farrar says he recognized as the tracks of the prisoner. This was considered by the Court as only the opinion of the witness and not proof; and upon the whole case, it was concluded that the facts proved were plainly insufficient to warrant the verdict of the jury, and a new trial was granted.

In delivering the opinion of the court in the *Garner Case, supra*, Judge Keith remarked:

"The utmost that can be said of the proof is that it shows the burning of the mill as the act of an incendiary; that the prisoner had the opportunity to commit the crime, and that he cherished ill feelings toward the owner of the property destroyed. These circmstances were sufficient to cause the prisoner to be suspected of the crime, and render an investigation of it proper to ascertain whether or not he had any connection with it, but, in our judgment, falls short of that degree of proof which warrants a conviction, or which will sustain a verdict, under our statute, which requires us to consider a motion for a new trial as upon a demurrer to the evidence by the prisoner. There is no evidence whatever which connects the prisoner with the crime charged, and all that is shown in the record may be true (doubtless is

true), and, at the same time, be entirely consistent with the innocence of the accused." (2 Va. Dec. at p. 459.)

Judge Cardwell, speaking for the court in *Jones* v. *Commonwealth, supra,* after citing the last two mentioned cases, said:

"It is true, as counsel contend, and unfortunately so, 'that in the nature of things it is generally extremely difficult to prove by direct testimony that an incendiary who sets fire to his neighbor's property acutally started the conflagration,' and this kind of proof is not required to convict of the crime of arson; but the coincidence of circumstances relied on to convict, however strong and numerous, must conclusively prove (1) the fact that the crime has been perpetrated, and (2) that the accused is the guilty party.

"If we were to concede that the evidence in this case was sufficient to show that the fire was incendiary, that the defendant had an opportunity to commit the crime, and that he cherished ill-feelings towards Carr, the owner of the property destroyed, this, according to the authorities which we have already cited, is not sufficient to warrant a conviction; and this, in our opinion, is all that the evidence for the Commonwealth considered under the rule governing its consideration, establishes. The most that can be said of the evidence is that it is sufficient to raise a suspicion of the guilt of the accused; but, in our opinion, it is plainly insufficient to warrant the verdict of the jury."

Though the circumstances in the case at hand differ in details from those in each of the cited cases and in some particulars the inferences that may be drawn are more incriminating, yet the vital question presented is the same as it was in each of those cases; *viz.*, Does the evidence as a whole measure up to the standard required in this type of case?

In the final analysis, it is our opinion that the guilt of this accused hinges upon whether or not it has been proved beyond a reasonable doubt that the sock-clad foot tracks about the barn were made by him. If so, it conclusively

establishes that he was present at and in the barn previous to discovery of the fire and at a time and under such circumstances as to point to the fact and justify the inference that the fire was of incendiary origin. Many circumstances indicate that the fire was purposely set. Yet no one or set of circumstances proved can satisfy the guarded judgment of that vital fact if there be reasonable doubt as to the identity of the tracks. Circumstances such as isinglass-flecked mud on accused's feet and his secretion or destruction of his shoes tend to establish that his bare feet had come in contact with mud similar to that around the barn (but not necessarily that mud) and raise a suspicion of guilt. Yet as heretofore stated, when the plaster casts made from two of the tracks at the barn are compared with the cast made from his known track, no real similarity is disclosed. In fact, obvious differences and dissimilarities appear. We are therefore led to the conclusion that this fact casts serious doubt upon the ultimate and most vital issue presented.

It was definitely established that accused was much under the influence of intoxicants but how long that condition had obtained or what he had been doing or where he had been during the day and early evening does not appear. To find one sockless and with mud in his shoes may to some be in and of itself convincing proof of departure from the road of sober rectitude. But the inebriacy of accused is not denied or in issue, and whether or not the tracks at and about the barn were those of this intoxicated individual or whether the somewhat irregular course of that pedestrian, whoever he may have been, was due to the darkness and uneven terrain over which he traveled instead of intoxication would be much a matter of opinion and speculation. Nor are we willing to say that under the facts shown, it is a condition and accomplishment beyond the realm of rational hypothesis for a drunken but innocent man to be sockless and have isinglass-flecked mud in his shoes. No incriminating inference may be drawn from his failure to testify and

explain his condition. Nor are we allowed to speculate upon where he may have been; what he may have done, or how he arrived at such a deplorable status. *Non constat*—he may not know himself.

The paucity of convincing proof of the identity of the maker of the tracks and the lack of certain necessary circumstances to be inconsistent with innocence are of such grave import as to leave the careful and guarded judgment uncertain as to the sufficiency of the proof to establish the corpus delicti and the criminal agency of the accused to the exclusion of all reasonable doubt. This being true, it necessarily follows that the judgment of conviction should be reversed, the verdict set aside, and a new trial awarded if the Commonwealth be so advised.

*Reversed and remanded.*