# Richmond

JACOB JEFFREY SMITH v. COMMONWEALTH OF VIRGINIA.

June 18, 1951.

Record No. 3816.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan and Whittle, JJ.

The opinion states the case.

*Carlton E. Holladay, M. W. Booth* and *W. Francis Binford,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General,* and *Thomas M. Miller, Assistant Attorney General,* for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

The defendant, Jacob Jeffrey Smith, has been sentenced to serve fifty years in the penitentiary for killing Robert West, pursuant to the verdict of a jury finding him guilty of murder in the first degree. His main assignment of error is that there was not sufficient evidence to support the verdict. Two other assignments, on the grounds of after-discovered evidence and the incompetence of a juror, were not relied on in argument.

West was killed about 9:20 on the night of June 16, 1949, by a bullet fired through the pane of a window and into his back as he stood in front of a refrigerator in the kitchen of his home in the city of Hopewell. No one saw the assassin and the Commonwealth relies on circumstantial evidence to prove that the defendant committed the crime. Only West's wife, his son Donald, thirteen years old, and a baby were present in the home at the time and they were in an adjoining room.

Smith is Mrs. West's brother, twenty-eight years old and a drug addict whose main occupation since a checkered career in the second world war has been the running of gambling concessions at carnivals. He was indicted in December, 1949, and arrested the following January in Louisiana. In the previous February, 1949, he had been an inmate of the South Carolina penitentiary, where he was seriously cut about the face and neck

by another prisoner and had escaped from the hospital where he had been sent for treatment. He was brought back from Louisiana and placed in the Hopewell jail, from which he escaped on March 6, 1950, and was recaptured in Florida on March 20.

Smith was familiar with the West home, having lived there for ten or twelve years as a boy. He had not been back and Mrs. West had not seen him for more than six years. Donald West, the son, testified that six or seven years ago his father and Smith were drinking and had a fight at the house, but were afterwards on friendly terms. Donald was only seven years old then and it developed he did not see the fight and ''only know what they told me.''

One John Janosik, who lived in a trailer in Hopewell about a mile from the West home, was a frequent visitor there. Mrs. West testified that she became intimate with him seven years ago and in February, 1949, he took her to Florida to get a divorce from West, taking the baby along. The divorce did not go through and at her request West came down and brought her back home. She had left him before, she said, but always went back to him. She said that Janosik was always after her to get a divorce.

In the afternoon before the homicide a soldier named Wiles was a visitor at the West home. He arrived before West came from work, stayed on afterwards and had gone to a filling station across the street when the shooting occurred. He had furnished the beer, about 40 bottles, that was drunk during the afternoon and evening and Mrs. West had consumed about nine bottles he thought. She visited Janosik in his trailer a few hours after her husband was killed. Janosik did not appear to be too much surprised at the news. He said he had been to a ball game. Three months later he and Mrs. West were married.

The West home was not a quiet place. She testified that her husband had many enemies; that many people visited them; that her husband would drink and bring people in who would stay two or three days at a time and it was usually a brawl before it was over. She was asked whether these brawls resulted in the use of knives and guns, and she replied, ''Most anything in sight.''

The bullet hole through the window was five feet three inches from the ground and there were powder burns around it, indicating that the weapon had been held not more than 18 inches away. It had been raining that night and there were signs of tramping

on the grass about three feet back from the window, but no footprints there. Next morning an empty .32 caliber cartridge was found a few feet to the right of the window, recently fired from an automatic pistol. When Smith was arrested in Louisiana, the officers found in his possession a pistol which fired the same type of cartridge, but it was determined by a ballistics expert that the bullet in West's body was not fired from that pistol and none of the bullets in Smith's possession compared with the one that killed West.

Across a grass plot about 50 feet north of the window was a spaded garden where "considerable walking" had been done after the rain. Tracks could be followed across the garden until they turned east through a grass plot where it could be seen that someone had gone through the high grass and weeds. The West home was east of Palm street. A map filed in evidence indicated the line of the tracks as being generally east and then south across Palm street. In a garden on the south side of Palm street some tracks were found next morning which appeared to have been made by somebody running. An impression was made of a shoe print in the garden 50 feet from the house and of one on the south side of Palm street, 150 to 200 yards from the West house. In the cast of one of the heel prints appeared the name of the manufacturer of the shoe, Tom McAn. When Smith was arrested in Louisiana he had two pairs of shoes and the officer testified there was no connection between them and the shoe prints except the heel of one shoe was the same size as a cast made of the print south of Palm street. The shoes and the casts are exhibits before us. Comparison leaves doubt that the cast and any heel of Smith's shoes are the same size.

The Commonwealth introduced Harry Hatchell, who lived on Palm street about two blocks from the West home, and who testified that he had known Smith well for about twenty-four years. On the night of the shooting he was on his porch starting to work when he heard the report of a gun from the direction of the West house. It was raining and as he stepped out into the street and was looking down toward Hopewell for his bus, and toward a street light which was three houses below his, he heard a noise and saw a man run "between the garden and the next house and down on a knee." He could see nothing but his shoulders but he raised up as he came to the street and Hatchell could see the left side of his face. He testified he did not recog-

nize the man and did not know who he was. The Common-
wealth's attorney was allowed to cross-examine him and he
denied that he had stated to the officers that he thought it was
Jake Smith. One of the officers then testified that Hatchell had
said the man carried himself like Jake Smith and another testi-
fied that Hatchell said that from the way the man carried him-
self he thought it was Jake Smith. The court properly in-
structed the jury that the evidence of the officers was not testi-
mony against Smith but went only to the credibility of Hatchell.
*Smith v. Commonwealth,* 168 Va. 703, 190 S. E. 91.

The Commonwealth relies on the above stated evidence and
some contradictions in and of various statements made by Smith
to make out its case.

Smith was questioned at length on at least three different
occasions by the officers, and by a psychiatrist twice normally
and three times under so-called truth drugs.

When he was arrested in Louisiana, in January, 1950, he
was brought back by the chief of police of Hopewell and an in-
vestigator of the Virginia State police. On that occasion he told
the officers of his escape on February 21, 1949, from the hospital
while a prisoner in South Carolina, saying that he took the drugs
left beside his bed and when he came to his senses he was in
Florida. He stated that some two months later he came to Rich-
mond and got a job with a show; that Janosik came to see him
there, told him that West was mistreating his (Smith's) sister;
that he (Janosik) loved her and he offered Smith money to do
away with West. He also told the officers that later, on June 15,
1949, he came to Petersburg to look up a girl. On that occasion
he called Janosik and went down and spent the night of the 15th
with him.

Again, on February 23, 1950, while Smith was in the Hopewell
jail, the investigator questioned him. Smith then said that back
in 1940, while he was in the service, Janosik had offered him $800
and other financial aid if he would dispose of West, and at sev-
eral later times Janosik repeated his offer and suggested differ-
ent ways of carrying out the plan. Smith said that he came to
Petersburg on June 15 by bus from Pennsylvania; that he was
then taking dope and did not know how he got to Janosik's
trailer; that Janosik again offered him $800 to kill West and
showed him a gun, he did not remember whether an automatic
pistol or revolver, and told Smith that would be a good gun to do

the job with because nobody knew he (Janosik) had it. While he was there Janosik went out and brought back beer and a second time he brought back a considerable roll of money which he gave to Smith. Smith said he became sick and Janosik took him back to Petersburg; that on the morning of the 16th he caught a bus to Norfolk and went on to Virginia Beach to investigate concessions there; that he left Norfolk and came back to Petersburg that day and went to a hotel. Later he inquired at some of the restaurants about his girl, then started towards the bus station at "dusky dark," and that was all he remembered until he came to his senses in a hotel in Washington. He denied that he had killed West. The investigator asked him if it was possible he did it under the influence of narcotics but he said he did not think so.

On the trip back to Hopewell from Florida, in March, 1950, the investigator questioned Smith again at length in regard to previous statements and Smith repeated, with very little change, what he had said on the questioning of February 23. He stated to the officer that he still wanted to take the truth serum and "in very broad language" that he did not care what came out of it.

The investigator testified that about the only difference between the last two statements and the first was that in the first, on the way back from Louisiana, Smith said he went from Norfolk back up the eastern shore to Pennsylvania and did not mention coming back to Petersburg.

At his own request Smith was examined three times under the so-called truth serum with an agreement that the questions and answers could be used in evidence either for or against him. These examinations were conducted by Dr. Brick, psychiatrist of the Virginia penitentiary, who testified that he had examined Smith orally twice, under a drug twice, and a third time under a gas. The first examination under a drug was to study Smith's personality. The doctor testified that this study revealed that Smith was the product of an unfavorable childhood, impulsive, unable to stick to any particular rule, given to wandering and seeking a change of scenery, unable to experience the feelings of others; that he had "what we call a flattening of his emotional life;" that it was possible for him to have a total mental blackout by the taking of drugs and the use of alcohol.

He testified that in the case of a neurotic personality the truth will come out with the so-called truth serum; but that Smith

was not a neurotic and in such a person, particularly in a case of murder, the truth will seldom come out. Its real benefit, he said, lies in furnishing leads, as a man under its influence might make a slip; but that a person not a neurotic could very well stick to a story he had already made up in his own mind.

Smith was examined under the truth serum on April 28 and again on May 7, 1950, and the results of both examinations were introduced in evidence by the defendant. Both examinations were searching and included questions designed to lead Smith into admissions and contradictions. They were not fruitful. On both occasions his statements were the same in substance as, but somewhat more in detail than, those made to the officers in February and March. Dr. Brick testified that in all these tests Smith gave him practically the same answers and any difference was very small.

In the April examination at one point Smith said Janosik gave him money on the evening of the 16th, and at another that he registered at the Lee Hotel in Petersburg the evening of the 16th, but he corrected both events to the 15th. At another point in the April examination he said that on arriving in Washington from Petersburg he registered at the D. C. Hotel. Later he said he registered at the Capitol Hotel, in Richmond, on the night of the 16th, then explained he meant the Capitol Hotel in Washington, and said he was not in Richmond except to pass through on the bus to Washington.

The effort of the Commonwealth was to show that Smith was in Petersburg on the night of the 16th when the murder was committed and that his visit to Janosik was on the night of the 16th instead of the 15th, as Smith claimed. It introduced the Lee Hotel register to show that on June 16th Bob Randall, Norfolk, Virginia, had registered. That name was an alias which Smith admitted he sometimes used. The defendant insists that this proves nothing because it is obvious from the register sheet that there is an erasure and that the original entry was the 15th, written over to convert it to the 16th. The sheet also shows an erasure and change in the date preceding the entry of June 16th. There is no explanation of these changes other than that the register was open to the public and any change was made before it came into the hands of the officers. Whether there is any significance in the changes cannot be determined from the record.

The Commonwealth also introduced a register card from

the Capitol Hotel, Richmond, showing that Joe Wertz and Robert Clark registered there June 17, 1949, at 11:42 p. m. Robert Clark was also an alias that Smith admitted he sometimes used. This is the hotel where Smith stated at one point in his April 28 examination he stayed after leaving Petersburg on the 16th and later said he meant the Capitol Hotel in Washington. However, the investigator testified he could see no similarity between the writing on the Capitol Hotel card or on the Lee Hotel register and Smith's true signature. The investigator testified he also checked a number of hotels in Washington that might have fitted the description of the hotel where Smith said he stayed, but could find no registration between June 15 through June 19 in Smith's name or in the name of any of the aliases Smith admitted using.

Charles Perry, witness for the Commonwealth, testified he had known Smith since 1941, when Perry's duty as military policeman in the army brought him into some unpleasant associations with Smith. He said that on June 16th, from his seat on a bus, in Petersburg, he saw Smith between 5:15 and 5:30 p. m. come out of the Lee Hotel and stand in the doorway for a moment and then go toward Sycamore street and the theater district. Smith had said in his examinations under the truth drugs that he had gone to the theater before leaving for Washington that night. Perry said Smith was nicely dressed, standing up very good, and he noticed ''this terrific scar starting from the eye and going along his neck.''

In both examinations under the truth serum Smith stated that his sister, Mrs. West, had said that West had pulled a gun on a man named Slocum, who ran an iron foundry in Hopewell, and had threatened him; and that Slocum had then told West if he did not make a good job of it in less than three days, Slocum would kill him, and in less than three days West was dead. Smith said that his sister had told the chief of police that there were witnesses who heard it. No reference was made to this statement by the chief of police or Mrs. West in their testimony.

When all the evidence for the Commonwealth is put together and boiled down, its substance is that Smith was in Petersburg as late as 5:30 on the afternoon of June 16th, nearly four hours before West was killed. No witness puts him closer than that to the West house in Hopewell, several miles away, although the scar on his face should have made him easy to identify. A wit-

ness who had known him practically all his life refused to identify him as the figure running away immediately after the shot was fired. No connection was shown between the bullet found in West's body and any weapon in Smith's possession. Across a much-traveled street and 150 to 200 yards from the West home was a heel print, said to be the same size as the heel on a shoe owned by Smith. It was found next day and, of course, could have been made by any one of many shoes.

No motive is shown for Smith to do the killing other than the money offered him by Janosik, the evidence as to which came from Smith himself, who steadfastly denied in all of his examinations that he committed the crime, and insisted that he thought more of West than he did of Janosik. Smith said the money Janosik gave him was not more than $50. Smith's brother, called by the Commonwealth, testified that Janosik gave him (the brother) $750 to give to counsel first employed to defend Smith.

To strengthen links in the chain of circumstances, or rather to supply missing links essential to piece out the chain, the Commonwealth relies on the discrepancies in Smith's account of his activities the day before and the day of the killing, coupled with a statement made by Smith, according to a companion in the Hopewell jail, that "if he burned for this he was going to burn someone else with him."

In *Massie v. Commonwealth*, 140 Va. 557, 564, 125 S. E. 146, 148, we said that in cases of circumstantial evidence much weight is to be given to contradictory statements of material facts, but that they are not conclusive of guilt. "They should be considered along with the other facts and circumstances shown in evidence to determine whether, upon the whole case, the evidence excludes every reasonable hypothesis consistent with his innocence. It is not sufficient that the facts and circumstances proven be consistent with his guilt. They must be inconsistent with his innocence."

It is, of course, a truism of the criminal law that evidence is not sufficient to support a conviction if it engenders only a suspicion or even a probability of guilt. Conviction cannot rest upon conjecture. The evidence must be such that it excludes every reasonable hypothesis of innocence. The giving by the accused of an unclear or unreasonable or false explanation of his conduct or account of his doings are matters for the jury to consider, but they do not shift from the Commonwealth the

ultimate burden of proving by the facts or the circumstances, or both, that beyond all reasonable doubt the defendant committed the crime charged against him. *Burton* v. *Commonwealth,* 108 Va. 892, 62 S. E. 376; *Woods* v. *Commonwealth,* 140 Va. 491, 124 S. E. 458; *Dixon* v. *Commonwealth,* 162 Va. 798, 173 S. E. 521; *Sutherland* v. *Commonwealth,* 171 Va. 485, 198 S. E. 452; *Smith* v. *Commonwealth,* 185 Va. 800, 40 S. E. (2d) 273; *Thomas* v. *Commonwealth,* 187 Va. 265, 46 S. E. (2d) 388; *LaPrade* v. *Commonwealth,* 191 Va. 410, 61 S. E. (2d) 313.

■ In this case we accord to the verdict of the jury approved by the trial judge the great weight it is entitled to have, both as to the credibility of the witnesses and the inferences from the facts proved. But dastardly as was the crime, important as it is that the person who committed it be adequately punished, and whatever may be the record and the character of the person charged, it is required under our system of law that before life or liberty is exacted the evidence shall leave no reasonable doubt of the defendant's guilt. That cannot fairly be said of this evidence. It is possible, or it may be probable, that this defendant is guilty, but we are unable to find in this record evidence sufficient to warrant the conclusion that beyond a reasonable doubt he is the person who perpetrated the crime.

The judgment of conviction is therefore reversed and the case is remanded for a new trial if the Commonwealth be so advised.

*Reversed and remanded.*