# Richmond

## GRANT VAN DYKE v. COMMONWEALTH OF VIRGINIA.

April 25, 1955.

Record No. 4354.

Present, All the Justices.

The opinion states the case.

*Crockett & Gillespie,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General* and *C. F. Hicks, Assistant Attorney General,* for the Commonwealth.

WHITTLE, J., delivered the opinion of the court.

This case is before us upon a writ of error awarded Grant Van Dyke to a judgment rendered by the Circuit Court of Tazewell County on July 9, 1954. Van Dyke was found guilty of maliciously wounding Benjamin F. Oakes and pursuant to the jury's verdict sentenced to serve five years in the State penitentiary.

██ Four assignments of error are relied upon by the accused. The second assignment deals with court's refusal to give an instruction offered by the defendant, and the third deals with the giving of two instructions on behalf of the Commonwealth. These assignments will not be considered by us for the reason that the defendant did not properly preserve exceptions to the court's ruling as required by Rule 1:8[1]. *Smith* v. *Commonwealth,* 165 Va. 776, 781, 182 S. E. 124; *James* v. *Haymes,* 160 Va. 253, 168 S. E. 333; *Harlow* v.

[1] Rule 1:8 provides, in part, as follows:
"In civil and criminal cases, all objections to writs of every kind, pleadings, instructions, notices, the admissibility of evidence, or other matters requiring a ruling or judgment of the trial court, shall state with reasonable certainty the ground of objection, and unless it appears from the record to have been so stated, such objections will not be considered by this Court except for good cause shown, or to enable this Court to attain the ends of justice."

*Commonwealth*, 195 Va. 269, 273, 274, 77 S. E. (2d) 851; *Davidson* v. *Jackson*, 193 Va. 330, 68 S. E. (2d) 524.

In our view of the case, however, the remaining two assignments of error are crucial. They read:

"(1) The trial court erred in refusing to grant the motion of the defendant to strike the evidence of the Commonwealth, for the reason that such evidence was insufficient to sustain a verdict of guilty."

"(4) The trial court erred in refusing to grant the motion of the defendant to set aside the verdict of the jury in the case as contrary to the law and the evidence, and not supported by the evidence."

These assignments require a full statement of the evidence, which includes only that offered on behalf of the Commonwealth, no evidence being offered by the accused.

It was agreed that the "pertinent" evidence introduced was as follows:

"About three weeks prior to April 26, 1953, Benjamin F. Oakes, who had theretofore been living in Florida, became the construction foreman for one J. C. Heldreth, * * * of Tazewell * * *. Upon attaining this position, Mr. Oakes, his wife and children established a home in a trailer just off of what is known as the Jones Chapel road, in Tazewell County * * *.

"On Sunday, April 26, 1953, Mr. and Mrs. Oakes, and two of their small children left their home for an afternoon drive. During the course of the afternoon, Mrs. Oakes suggested that they visit an aunt of hers, Mrs. George Johnson, who lived on Red Root Ridge, * * * whom she had not seen for approximately seven years. They drove up the Red Root Ridge road, for some distance, and it finally became apparent to Mrs. Oakes that they had passed the home where her aunt was supposed to live. They thereupon turned around, and proceeded back over the same road in the 1951 Willys station wagon * * * driven by Mr. Oakes, until they came to what Mrs. Oakes thought was the home of her aunt. This house was situated near the top of Red Root Ridge, and to the left

of the highway, in the direction the Oakes' were then traveling. A driveway in the shape of an arc left the highway at a point about fifty or sixty feet above this house, and curved toward the yard gate leading thereto, then curved back into the highway at a point near opposite said house. Between the driveway and the highway was situated an old rather dilapidated barn. About thirty to forty feet up said highway from the house and just outside the yard fence surrounding said house was situated a small flat roofed building, described by Mr. Oakes as a crib.

"When Mrs. Oakes saw the above described premises, she thought they were those of her aunt, and Mr. Oakes drove his station wagon into the driveway, parked his vehicle, got out and walked into the yard. When he had gotten about halfway between the yard gate and the porch of the dwelling house, the defendant, Grant Van Dyke and one or two small children came out of the house. The children walked out into the yard and started playing and the defendant remained upon the porch. Oakes asked the defendant if George Johnson resided there. The defendant replied that George Johnson had lived there, but had moved to North Carolina, and that Grant Van Dyke was living there then, and had moved there that day. Oakes thanked the defendant, returned to his station wagon, started the motor and attempted to back out of the driveway onto the highway. The first attempt to back out into the highway was unsuccessful, and it was necessary for him to pull back up into the driveway, and upon so doing, he again looked up to the dwelling house, and saw the defendant, Grant Van Dyke, still standing on the porch.

"Oakes' second attempt to back out into the highway was successful, and when he had driven forward thereon for approximately twenty feet, he turned his head slightly to his right to say something to Mrs. Oakes when a bullet passed through the left front side window of the station wagon, and into the left rear part of his head, lodging in about the center of his brain. This wound has practically completely paralyzed him on his right side. According to the testimony of

Mrs. Oakes, the Willys station wagon had travelled down the highway for approximately twenty feet, and was about opposite the Van Dyke house when the shot was fired. According to the testimony of Mr. Oakes, the station wagon had travelled down the highway approximately twenty feet, and was about exactly opposite the small, flat-roofed building, described by him as a crib, when the shot was fired. While the window of the station wagon was down from the top three or four inches, neither Mr. Oakes nor Mrs. Oakes heard any report of any firearm, but did hear the breaking of glass similar to that of a breaking bottle. At the time the shot entered Mr. Oakes' head, the station wagon was in motion, and the highway was slightly downgrade. It continued to travel down the highway, according to Mrs. Oakes, for 'a few yards' or to a point slightly below a point opposite the dwelling house where the defendant lived before Mrs. Oakes was able to get it stopped, and just a few feet beyond the intersection of the lower end of the driveway and the road.

"Upon getting the station wagon stopped, Mrs. Oakes opened the left front door and Mr. Oakes fell out onto the road, and partially under the station wagon. Mrs. Oakes also got out of the station wagon, and was crying and screaming for help when she saw the defendant, his wife, and several small children get into a pickup truck, which had been parked in the driveway, and drive out of said driveway down into the highway past the Oakes' station wagon. As the Van Dyke truck passed the Oakes' station wagon, Mrs. Van Dyke, who was sitting on the right side, looked straight at Mrs. Oakes, who was waving her arms, but the Van Dyke truck passed on without stopping.

"A short time thereafter, Mrs. Oakes went to another home in the neighborhood, and was able to get a man * * * to drive her and her husband to the Clinch Valley Clinic Hospital. This occurred at around 7:00 to 7:30 p.m.

"Between 11:00 p.m. and 12:00 midnight, of that day, the Sheriff and two Deputy Sheriffs, of Tazewell County, went to the home of the defendant and knocked upon his front

door. After several minutes, someone from within called out and wanted to know who was there. The Sheriff replied that it was the Sheriff, and to open the door as he wanted to see him. After about ten or twelve minutes, the defendant came to the door in a somewhat intoxicated condition. The officers entered the house, and one of them found a .32 caliber Smith and Wesson revolver either hanging on a nail or lying on a dresser, which appeared to have been recently cleaned and oiled, but which smelled as if it had been recently fired. One of the officers asked the defendant how long it had been since he had fired this revolver. The defendant at first stated that it had been about a month, but later said that he had been shooting at a spot on a tree that afternoon. The officers then asked the defendant if Mr. Oakes had been at his home early that evening, and the defendant replied that he did not know Mr. Oakes, and furthermore, that no one had been at his home. The defendant was then arrested, taken to Richlands, and placed in jail, where the charge of wounding Benjamin Oakes was formally placed against him.

"The following morning, the Commonwealth's Attorney, and one of the Deputy Sheriffs again interviewed the defendant at the jail in Richlands, and again the defendant denied that Oakes or any other person had been at his home the evening before. Mr. E. L. Mathena, one of the deputy sheriffs who participated in the arrest of the defendant, and the investigation of the case, testified that the defendant appeared to be a completely uneducated and ignorant man.

"The day following the shooting, Deputy Sheriff Mathena returned to the Van Dyke premises for further investigation. He testified that the bullet had entered the Oakes station wagon at a point almost exactly at right angles, and that if the station wagon had been at a point opposite the crib, it would have been impossible for the bullet to have penetrated the glass window of the station wagon, and the head of Mr. Oakes, in the manner revealed by his investigation, had it been fired from the Van Dyke porch, as the house was situated down the highway from the crib a distance of approximately

thirty to forty feet. Mr. Mathena further testified, however, that the fence around the Van Dyke home extended up Red Root Ridge to a point close to the building described by Oakes as a crib, and that the shot could have been fired from the yard near the fence separating the yard from the crib. Mr. Mathena further testified that the crib was located just a few feet below the upper intersection of the driveway and the highway, and that the Willys station wagon, after the shooting, had been brought to a stop on the right hand side of the road just a few feet below the lower intersection of the driveway and highway, and just a few feet below the Van Dyke house. Mr. Mathena further testified that the Van Dyke home and crib were located below, but near the crest of Red Root Ridge; that the road was located several feet below these buildings, and that, in his judgment, the bullet which wounded Mr. Oakes could not have come from any point beyond the top of Red Root Ridge.

"Mr. and Mrs. Oakes further testified that the defendant, while standing on his porch before the shot was fired, appeared to be somewhat intoxicated. However, at no time did they ever see him with any firearm of any kind nor did they ever see him leave his front porch. They further testified that they did not see anybody other than Grant Van Dyke and the small children in the vicinity at the time of, and immediately prior to the time of the shot.

"Oakes was hospitalized for a period of several months, and due to the fact that the bullet was lodged in the approximate center of his brain, it was impossible to operate and secure the bullet which wounded him. * * *, and it was impossible to show what type or caliber of bullet produced the wound."

In considering the sufficiency of the evidence we are confined to the exhibits in the case, the above quoted statement of the evidence, and the just inferences which may be drawn therefrom.

It has long been held that circumstantial evidence is legal and competent in criminal cases, and if it is of such a convincing character as to exclude every reasonable hypothe-

sis other than that the accused is guilty, it is entitled to the same weight as direct testimony. *Longley* v. *Commonwealth*, 99 Va. 807, 811, 37 S. E. 339; *Abdell* v. *Commonwealth*, 173 Va. 458, 470, 2 S. E. (2d) 293.

It is also the rule in this jurisdiction and others that when a conviction is sought upon circumstantial evidence alone such evidence is to be acted upon with the utmost caution, and before a verdict of guilty will be sustained every fact necessary to establish the guilt of the accused must be proved beyond a reasonable doubt. *Abdell* v. *Commonwealth, supra,* 173 Va., at page 470.

Since the decision in *Dean* v. *Commonwealth* (1879), 32 Gratt. (73 Va.) 912, it has been the rule in Virginia that where circumstantial evidence is relied upon to support a conviction the burden is upon the Commonwealth to show that "time, place, motive, means and conduct concur in pointing out the accused as the perpetrator of the crime". We have held, however, that proof of motive does not establish the guilt "nor the want of it establish the innocence" of the accused; that while proof of motive is not necessary, it is a factor to be considered bearing only upon the question as to whether or not the accused committed the crime. *Ferrell* v. *Commonwealth*, 177 Va. 861, 873, 874, 14 S. E. (2d) 293, 298.

 Since the verdict of the jury has settled conflicts in the evidence in favor of the Commonwealth, we are concerned only with the question as to whether or not the evidence is sufficient to sustain the verdict of guilty.

The Commonwealth argues that certain statements made by the accused and his conduct after the wounding are inconsistent with his innocence and are consistent with his guilt. It is pointed out (1) that the accused and his wife passed Oakes and his family by, after the shooting, and did not stop to administer to them; that as Mrs. Oakes was screaming and waving her arms "the defendant's wife looked at Mrs. Oakes" but the Van Dykes passed by without stopping; (2) that later on the night of the shooting, after the officers had found a

revolver in the Van Dyke home the accused at first stated that it had not been fired for a month, later changing his statement by saying that he had fired it that afternoon at a spot on a tree; (3) that the accused denied that Oakes had been at his home on the afternoon of the shooting.

It is conceded that the contradictory statements made by the accused and his action in not stopping to render aid to Oakes are suspicious circumstances which might tend to show criminality on his part, but such are not conclusive evidence of his guilt. They are to be considered along with other facts and circumstances shown by the evidence, in order to determine whether, upon the whole case, the evidence excludes every reasonable hypothesis consistent with his innocence. It is not sufficient that such facts and circumstances be consistent with guilt, they must also be inconsistent with innocence. *Massie* v. *Commonwealth*, 140 Va. 557, 564, 125 S. E. 146.

The stipulated evidence does not show that the accused knew that Oakes had been wounded or that he saw or knew of the plight of Oakes in the road after the shooting. It is stated that Mrs. Van Dyke saw Mrs. Oakes in the road waving her arms. In order to bring knowledge of the situation to the accused we would have to speculate that Mrs. Van Dyke knew that Oakes had been wounded and that she so informed the accused and told him what she saw in the road.

The following circumstances drawn from the evidence also appear:

(1) Admittedly, the shot could not have been fired by the accused if he remained on the porch where he was last seen by Oakes a few seconds before the shot was fired. The deputy sheriff says the bullet entered the station wagon at right angles and could not have been fired from the porch. In order to place the accused at a point from which it is stated the shot could have been fired we must speculate that he ran to such point in the few seconds it took for Oakes to drive twenty feet down the roadway. Oakes admits that when he

backed into the roadway the accused was standing on the porch and no gun was in sight.

(2) The evidence is not plain as to who was at the home of the accused when the shot was fired. No one was seen there except the accused and "one or two small children" when Oakes first drove up into the yard. After the shooting Mrs. Oakes saw "the defendant, his wife and several small children get into the pickup truck". It is not shown that they were the only persons on the premises at the time. There may have been others present, we do not know.

(3) Even if we assume that the accused, his wife and "several small children" were the only ones on the premises at the time, there is no evidence in the record to exclude the wife from having fired the shot. It is not shown where she was at the time the shot was fired. Furthermore, there is no indication as to how "small" the "several children" were. They were evidently large enough to "walk out into the yard and start playing", and Mrs. Oakes says she saw them get into the pickup truck. There is nothing in the record save the adjective "small" which would exclude the gun having been fired by one of the children.

(4) Had either his wife or one of his children fired the shot, or had it been fired by some person on the premises not disclosed by the record, the contradictory statements and actions of this "completely uneducated and ignorant man" would probably not have been different.

(5) So far as the record is concerned the shot did not necessarily come from the Van Dyke premises. It could have come from any point within range and "at right angles" to the station wagon. The point from which the bullet could have been fired was limited only by the deputy sheriff who said it could not have come "from any point beyond the top of Red Root Ridge." The picture exhibits disclose quite a wooded territory within that limitation.

(6) The record is silent as to the caliber of the bullet which wounded Oakes. The bullet is now lodged in his brain; it might have been fired from a rifle or a pistol, we do

not know; and, as aforesaid, its caliber is not shown. No attempt was made to show the size of the wound.

(7) Had it been proved that the bullet was fired from the pistol found in the home, this, of course, would limit the conjecture and speculation as to who fired the shot to those on or near the premises at the time, but even this would be insufficient to prove beyond a reasonable doubt that the accused did the shooting.

(8) A circumstance hardly pointing to the guilt of anyone on the premises of the accused is the fact that the revolver was found by a deputy sheriff in plain view, "either hanging on a nail or lying on a dresser". It would be natural to assume that even a completely "ignorant man" would attempt to conceal the weapon used by him or a member of his household in the commission of a crime.

(9) Another circumstance which would indicate that the shot came from a place other than the premises of the accused is the fact that although the window of the station wagon was partly lowered at the time, neither Mrs. Oakes nor her husband heard the report of the gun although they did hear the "breaking of glass". It is probable that had the gun been fired from the near-by premises the occupants of the station wagon would have heard the shot.

(10) The absence of motive, when considered with the related circumstances, points to innocence rather than guilt. While, as aforesaid, the proof of motive is not necessary, the lack of such proof is an important factor bearing upon the question as to whether or not the accused committed the crime. *Ferrell* v. *Commonwealth, supra.*

Conceding the existence of suspicious circumstances, the evidence falls short of that degree of proof which is necessary for a conviction. "* * * (C)ircumstances of suspicion, no matter how grave or strong, are not proof of guilt sufficient to support a verdict of guilty. The actual commission of the crime by the accused must be shown by evidence beyond a reasonable doubt to sustain his conviction." *Powers* v. *Commonwealth*, 182 Va. 669, 676, 30 S. E. (2d) 22, 25.

As was said by Mr. Justice Buchanan, in *Smith* v. *Commonwealth*, 192 Va. 453, 462, 65 S. E. (2d) 528, 534:

"(I)t is required under our system of law that before life or liberty is exacted the evidence shall leave no reasonable doubt of the defendant's guilt. That cannot be fairly said of this evidence. It is possible, or it may be probable, that this defendant is guilty, but we are unable to find in this record evidence sufficient to warrant the conclusion that beyond a reasonable doubt he is the person who perpetrated the crime."

It was said in *Dean* v. *Commonwealth, supra,* 32 Gratt. (73 Va.) at page 926: "(T)he evidence is powerfully strengthened by the total absence of any trace or vestige of any other agent." This reasoning does not apply to the case at bar. Here several known agents could have either maliciously or accidentally fired the shot, and the accidental wounding by an unknown agent cannot be excluded.

The most that can be said is that the contradictory statements made by the accused, and his conduct in passing by the wounded man, if he knew he was wounded, are sufficient to raise a suspicion of guilt, but in our view such are plainly insufficient to warrant the verdict of the jury. *Hatchett* v. *Commonwealth*, 76 Va. 1026; *Bundick* v. *Commonwealth*, 97 Va. 787, 34 S. E. 455; *Brown* v. *Commonwealth*, 97 Va. 791, 34 S. E. 882; *Massie* v. *Commonwealth, supra; Powers* v. *Commonwealth, supra; Thomas* v. *Commonwealth*, 187 Va. 265, 46 S. E. (2d) 388; *LaPrade* v. *Commonwealth*, 191 Va. 410, 61 S. E. (2d) 313; *Smith* v. *Commonwealth, supra*, 192 Va. 453, 65 S. E. (2d) 528.

For the reasons stated the judgment of conviction is reversed, the verdict set aside, and the case remanded for a new trial if the Commonwealth be so advised.

*Reversed and remanded.*