### Richmond

## JAMES TAYLOR HYDE v. COMMONWEALTH OF VIRGINIA.

April 22, 1977.

Record No. 760732.

Present, All the Justices.

*Paul M. Shuford (George H. Martin, Jr.; Gilbert A. Bartlett; Smith, Athey, Phillips, Bartlett & Skinner, P. C., on brief), for plaintiff in error.*

*Thomas D. Bagwell, Assistant Attorney General (Andrew P. Miller, Attorney General; Burnett Miller, III, Assistant Attorney General, on brief), for defendant in error.*

Poff, J., delivered the opinion of the court.

Convicted in a bench trial, James Taylor Hyde was sentenced by orders entered February 9, 1976 to confinement in the penitentiary for 10 years for rape and 15 years for murder of the second degree. On the murder conviction, he was placed on probation without supervision, conditioned upon good behavior for life. Pre-trial psychiatric examinations showed that Hyde, a voluntary patient at Eastern State Hospital whose condition was diagnosed as schizophrenia, paranoid type, was competent to stand trial and assist in his own defense. Members of the commission who conducted post-conviction examinations found that Hyde was not insane but agreed that further psychiatric care was indicated.

The dispositive question is whether the evidence was sufficient to support the two convictions, and under familiar principles, we review the evidence in the light most favorable to the Commonwealth.

The victim, an adult female with a mental age of 10 years, was also a patient at the hospital. At about 3:30 p.m. on September 15, 1975, she appeared at Building 28, crying and upset. Her blouse was unbuttoned and her brassiere was torn. Her clothing was covered with wood debris, and there were signs of blood around her lips, on her brassiere, and on the cuff of her coat. Physical examination revealed contusions on her neck, chest, arms, and abdomen and two lacerations of the vagina. Analysis of a vaginal smear showed the presence of spermatozoa. The victim complained of pain in the abdominal area. Two days later, she died of peritonitis resulting from a ruptured intestine.

The victim told the hospital authorities that a man she described as "a tall, white man" who had offered her a cigarette had taken her into the woods and raped her. She said she did not know his identity. Asked if she were not simply trying to protect someone, she hung her head and cried. The record shows that Hyde was a tall, white man.

Several witnesses testified that they had seen Hyde and the victim together on September 15. Two hospital employees saw them between 1:00 p.m. and 2:00 p.m. in the lounge of Building 9 where Hyde lived. Hyde had his arm around the victim, and they were smoking cigarettes and talking. A third employee testified that she saw them between 1:00 p.m. and 1:30 p.m. walking

hand-in-hand on the lawn, and that Hyde had kissed the victim "right in the mouth". A fifteen-year-old patient testified that sometime after the lunch period, which she fixed at 11:30 a.m. to noon, she saw Hyde and a man she did not recognize walking with the victim towards the woods located approximately 50 yards behind Building 27.

The testimony of the investigating officers concerning a series of interviews with Hyde shows that he made many contradictory statements. When first interrogated the day the victim died, he denied being in her company on September 15. Confronted with one of the witnesses who had seen them together, he admitted that he had talked with the victim and had placed his arm around her but denied that he had kissed her or given her cigarettes. Later, he admitted that he had kissed her and given her cigarettes to which she had become "addicted". Hyde said that he had never had sexual relations with any of the patients, but he was expressly contradicted by a patient who said that she had engaged in sexual intercourse with him. Told that he had been seen in the basement of the administration building kissing a woman and placing his hand on her leg, he first denied the story but, in the presence of the witness, admitted it. At one point, he agreed to "tell everything" if allowed to talk with two doctors he knew but changed his mind before they arrived.

Initially, Hyde denied that he had gone into the woods with the victim. He said that after he gave her the cigarettes, she left Building 9 alone and he lay down and took a nap until 3:15 p.m. Later, he said that he and the victim left Building 9 together about 1:30 p.m. and he could remember nothing after that. Asked if he had gone into the woods with the victim, Hyde answered, "I may have done it, but my conscious won't let my subconscious make me say it."

Still later, in an interview conducted October 23, 1975, the officer asked Hyde where the rape and beating took place. Hyde replied, "In the woods area, behind Building 27." During this interview, Hyde also admitted that he had entered the woods with the victim. Asked who was present, he named the victim, Robert Foxworth, and Claude Tolbert.

Tolbert was never located, but an officer interviewed Foxworth, a patient at the hospital, and read his statement into the record:

"Around the 15th of last September, I left Building 24, to go to the canteen. Ate two donuts and drank a cup of coffee. Left there to go to the lobby. James Hyde and I met in the lobby. James Hyde went out the front door. [The victim] was 'setting' there on the steps, and Hyde sat beside her. He put his arm around her and kissed her. I heard — I heard Hyde ask [her] to go in the woods with him. I started to walk off and Hyde called me back, and said, 'Bob, I'm going to take [her] to the woods. Come on and go with me, and maybe she'll give you some.' We left to go to the woods behind Building 27. We were all holding hands. When we got into the woods, I asked her to take her clothes off, and she did. I dropped my pants and undershorts, and then had sex with her. After I finished having sex with her, she got up on her feet. I thought that she was going to tell on me, so I hit her in the stomach, and once in the face. She fell down, and I started beating her in the stomach again. I knocked her out, and in a little while she came to and jumped up, and started to run. Hyde was standing there watching me. He left me while I was screwing her."

Foxworth later retracted this statement. He explained that he had confessed because he wanted to "protect" Hyde. Foxworth repeated and retracted his confession "three or four times".

Called by the defense, a psychiatrist who had known Hyde for six years testified that "it is my clinical opinion that at no time during these six years has he ever shown the capacity to be able to show violence, or be involved in an interpersonal violent action." Other psychiatric testimony heard by the trial court before sentence was imposed described Hyde as intelligent, artistically gifted, docile, gentle, and self-critical.

The rape indictment was referenced to former Code § 18.1-44 (Repl. Vol. 1960). One of the classes of rape defined there was carnal knowledge of a female inmate of certain institutions.* At trial, the Commonwealth avowed that the victim had never been formally adjudged mentally ill, and Hyde was tried for rape of the first class defined in the statute, *i.e.*, carnal knowledge of "a female of sixteen years of age or more against her will, by force", and the rape and homicide were treated as parts of a unitary course of criminal conduct. We consider the cases in the

* As amended, the definition of this class of rape now appears in Code § 18.2-64 (Repl. Vol. 1975).

same posture. All agreed that the evidence was sufficient to establish the *corpus delicti* of the two crimes. The question is whether the evidence was sufficient to prove that Hyde either committed the offenses himself or aided and abetted another in the commission thereof.

The evidence was almost entirely circumstantial. The only direct evidence which tends to identify Hyde as a principal in the first degree was the victim's description of her assailant as a tall, white man who had given her a cigarette. The record does not contain a description of Tolbert or Foxworth, but to assume that Hyde was the only tall, white man who had given her a cigarette that day would be to assume too much. Clearly, the description the victim gave was not enough to prove to a moral certainty that Hyde was the actual perpetrator of the crimes.

In aid of that evidence, the Commonwealth relies upon the circumstances disclosed by other testimony. Several witnesses saw Hyde in the victim's company at different times and places. The couple engaged in amorous embraces, and Hyde gave her cigarettes. Hyde and another man were seen walking with the victim into a wooded area some time after the lunch hour, and the assault occurred some time before 3:30 p.m.

In his ruling on Hyde's motion to strike, the trial judge said, "I don't think the circumstances would be sufficient but for his many varied and inconsistent statements. . . ." The Commonwealth also lays great stress upon Hyde's contradictory statements and cites the rule that "[w]here a conviction rests upon circumstantial evidence, much weight is given to contradictory statements of material facts by the accused." *Toler* v. *Commonwealth*, 188 Va. 774, 781, 51 S.E.2d 210, 213 (1949).

Inconsistencies and contradictions in statements made by an accused may support an inference of guilty knowledge and raise a suspicion of guilt, but convictions may not rest upon suspicion. *See Van Dyke* v. *Commonwealth*, 196 Va. 1039, 1050, 86 S.E.2d 848, 854 (1955). Even when the contradictions are material and sufficiently significant to elevate suspicion to the level of probability, they do not relieve the Commonwealth of the burden of producing evidence which establishes guilt beyond a reasonable doubt.

"[E]vidence is not sufficient to support a conviction if it engenders only a suspicion or even a probability of guilt. Conviction cannot rest upon conjecture. The evidence must be such that it excludes every reasonable hypothesis of innocence. The giving by the accused of an unclear or unreasonable or false explanation of his conduct or account of his doings are matters for the jury to consider, but they do not shift from the Commonwealth the ultimate burden of proving by the facts or the circumstances, or both, that beyond all reasonable doubt the defendant committed the crime charged against him. [Citations omitted]." *Smith* v. *Commonwealth*, 192 Va. 453, 461-62, 65 S.E.2d 528, 533 (1951).

The probative value of Hyde's inconsistent statements must be determined in light of the situation in which they were made. Hyde was first interrogated by the investigating officers the day the victim died. In such an accusatory atmosphere, the most innocent and rational man might falsely deny any association with the victim of a heinous crime. Hyde was not a rational man, and the falsehoods he told could have been prompted, not by guilty knowledge, but by a paranoid fear that the truth would implicate him unjustly. While his falsehoods concerning his amorous conduct toward the victim and his sexual relations with other female patients tend to impair his credibility, they do not prove intent to commit forcible rape. Although his contradiction of his original denial that he had entered the woods with the victim shows that he was reluctant to admit that he had had an opportunity to commit the crimes, it does not prove that he exercised the opportunity. True, in answer to a question during the October 23 interview he named the place where the rape and beating occurred, but that statement, made as it was more than a month after the situs of the crimes had become common knowledge, does not prove that he committed the rape or administered the beating.

While it may be possible to draw suspicious inferences from Hyde's conduct on the day of the crimes and his contradictory statements in relation thereto, we are of opinion that, in the face of the presumption of innocence, such inferences are insufficient to prove beyond a reasonable doubt that Hyde committed the crimes as a principal in the first degree.

The Commonwealth insists that, even so, the evidence shows that Hyde was a principal in the second degree. Except for

the fact that Hyde and another man might have been present together at the scene of the crimes, there is nothing to prove that the two acted in concert in the actual perpetration of the crimes. The single circumstance upon which the Commonwealth relies to prove that Hyde aided and abetted the actual perpetrator is that "[i]t was *he* who *enticed* the victim into the woods" and she "would not have been in the woods at the time of the offenses but for the action of the appellant." It is true that Hyde gave the victim cigarettes. He held her hand, placed his arm about her, kissed her, and invited her to accompany him to a secluded spot. There was no evidence that she spurned his advances, that she refused his invitation, or that he used or threatened to use any force to persuade her to go with him. The Commonwealth chose the right word; Hyde may, indeed, have *enticed* her to engage in illicit sexual conduct. Yet, there is nothing whatever to support the inference that he did so with intent to commit rape and murder or to aid and abet another in doing so.

> "[M]ere presence and consent are not sufficient to constitute one an aider and abettor in the commission of a crime. 'There must be something done or said by him showing (a) his consent to the felonious purpose and (b) his contribution to its execution. To make him an aider or abettor, he must be shown to have "procured, encouraged, countenanced, or approved" the commission of the crime. * * * To constitute one an aider and abettor, it is essential that he share the criminal intent of the principal or party who committed the offense.' 1A Mich. Jur. Accomplices and Accessories § 4, pp. 66, 67, and cases there collected." *Jones* v. *Commonwealth,* 208 Va. 370, 373, 157 S.E.2d 907, 909 (1967).

■ We conclude that the evidence concerning enticement fails to show criminal intent and thus fails to convict Hyde as a principal in the second degree. Nor is there any evidence of any other word or deed that does so. On oral argument, the Commonwealth agreed that Foxworth's "confession" must be accepted in full or rejected in full. If accepted as probative evidence, Foxworth's statement tends to acquit Hyde altogether. If rejected as unreliable, the record is bereft of any account of what happened after the woman and two men were seen entering the woods. The mystery invites speculation. It is possible that, acting alone or with the aid of another person,

Hyde committed rape, or murder, or both. It is possible, too, that Hyde aided and abetted another in committing either or both crimes. On the other hand, it is possible that Hyde engaged in consensual intercourse, or in no sexual conduct at all, and, repelled by the violent assault committed by another, protested or perhaps intervened in defense of the victim, or, fearing the consequences of guilt by association, fled from the scene of the crimes.

But conviction cannot rest upon conjecture. The sanctions of the criminal laws are not invoked by random possibility, but only by proof that excludes every reasonable hypothesis of innocence. Viewing the evidence as a whole, we find no such proof in this record, and the judgments will be reversed and the cases remanded for new trials, if the Commonwealth be so advised.

*Reversed and remanded.*