COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Coleman and Fitzpatrick
Argued at Richmond, Virginia


MARY FRANCES WARWICK
                                    MEMORANDUM OPINION[*] BY
v.          Record No. 1336-95-2     JUDGE SAM W. COLEMAN III
                                         JULY 30, 1996
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
                    Timothy J. Hauler, Judge

            Angela D. Whitley for appellant.

            Margaret Ann B. Walker, Assistant Attorney
            General (James S. Gilmore, III, Attorney
            General, on brief), for appellee.


        Mary Frances Warwick appeals her bench trial convictions for

second degree murder in violation of Code § 18.2-32 and use of a

firearm in the commission of murder in violation of Code

§ 18.2-53.1.  Warwick contends that the evidence is insufficient

to prove that she murdered Jesse Lewis because it does not

exclude the reasonable hypothesis that a third party entered

Lewis' home and committed the murder.  We hold that the evidence

is sufficient to prove the defendant's guilt beyond a reasonable

doubt and affirm her convictions.

        When the sufficiency of the evidence is challenged on

appeal, "we review the evidence in the light most favorable to

the Commonwealth, granting to it all reasonable inferences fairly

deducible therefrom."  Bright v. Commonwealth, 4 Va. App. 248,

        [*]Pursuant to Code § 17-116.010 this opinion is not
designated for publication.

250, 356 S.E.2d 443, 444 (1987). "The judgment of the trial court shall not be set aside unless it appears from the evidence that said judgment is plainly wrong or without evidence to support it." Id. at 250-51, 356 S.E.2d at 444.

The evidence shows that the defendant placed an emergency 911 call on the morning of June 4, 1994, and informed the operator that Jesse Lewis, her seventy-three year old fiance, had attempted to kill himself. The defendant told the 911 operator that Lewis had shot himself in the leg and that he had been "very depressed." At first, the defendant reported that Lewis was awake and breathing, but when the operator instructed the defendant to "[l]ook at [Lewis'] chest and see if it's going up and down like he's breathing," the defendant responded that it was not and that she thought Lewis was dead. The operator told the defendant to "get a dry towel," which the defendant did, and to turn Lewis on his back, but the defendant responded that she could not turn him because "[h]e [was] too big for [her]." Although the defendant stated that the door to the residence was unlocked, she complied with the operator's instructions to go to the door and let the police in when they arrived.

Officers Robert Balducci and John Eyler responded to the call and were met outside by the defendant. She led them inside, where they discovered Lewis on his bedroom floor with a .38 caliber gun beside him. According to Officer Balducci, the defendant stated that Lewis "had been in poor health and was

- 2 -

depressed."  She also stated that no one else was in the house. The officers "made a quick check of the premises and found no one else in [the house] and saw no signs of any forced entry into the house."

Detective Russell A. LesCault arrived at the crime scene a short time later and performed gunshot residue tests on the defendant and Lewis.  In administering the test on the defendant, LesCault took samples from her skin on the top and inner portion of her thumbs and forefingers, and on her forehead, cheek bones, and chin.  Detective LesCault also checked the house and confirmed that all windows were "locked and secured and that there was "[n]o sign of forced entry to the residence or damage."

Douglas DeGaetano, an employee of the Division of Forensic Science, testified that he analyzed the gunshot residue tests administered by Detective LesCault and identified particles of primer residue on the defendant's left hand and face, and particles indicative of primer residue on her right hand and left hand.[1]  Further analysis revealed that the victim had particles of primer residue on both of his hands.  DeGaetano testified that "[a]n individual could get primer residue on their hands or face if they either fire a weapon or if they handle a dirty weapon or if they're in the close proximity to the discharge of a weapon." According to DeGaetano, the size of the particles he found on

_____
[1]DeGaetano testified that particles of primer residue contain lead, barium, and antimonium while particles indicative of primer residue contain two of these three elements.

the defendant's hands and face was consistent with one of these three methods of coming into contact with primer residue.

The autopsy of the victim revealed that he had been shot twice in the back, once in the left forearm, once in the left upper leg, and once in the back of the head. Lewis died from the wound to his leg, which ruptured the femoral artery, in combination with the wound to the back of his head. Consequently, the defendant stipulated at trial that, contrary to her initial statements during the 911 call, Lewis did not commit suicide.

At trial, the defendant testified that she was sleeping on the morning of the murder when she was awakened by a "pow." She heard a second and third "pow," and went to Lewis' bedroom, where she found him lying "at the foot of the bed" with "blood all over his leg." The defendant testified that she did not see his back or the back of his head, and that she put her hand on Lewis' neck, but could not feel a pulse. She then went to the kitchen to get the portable phone and returned to the bedroom to attend to Lewis. According to the defendant, the only other time she left Lewis' bedroom was to retrieve a towel from the hallway bathroom. The defendant further testified that her attention was focused on Lewis and that she "didn't know" whether anyone else was in the house at the time.

The defendant contends that the evidence fails to exclude the hypothesis that an intruder shot Lewis, deposited the gun on

the floor next to Lewis, and then exited the house through the front door undetected by her. In the alternative, the defendant contends that after shooting Lewis an intruder may have hid in the bathroom adjacent to Lewis' bedroom and then exited through the front door either when the defendant went to the kitchen to call 911 or when she retrieved a towel from the hallway bathroom. These hypotheses are not suggested or supported by the evidence; they are merely the product of defense counsel's ruminations. Cook v. Commonwealth, 226 Va. 427, 433, 309 S.E.2d 325, 329 (1983); Black v. Commonwealth, 222 Va. 838, 841, 284 S.E.2d 608, 609 (1981).

There was no evidence that an intruder, or anyone other than the defendant, was present when Lewis was shot. In order for an intruder to have shot Lewis, and escape the house undetected, he would have had to have done so before Lewis arrived at the scene, or by secreting himself in the house and escaping undetected through the front door prior to the arrival of Officers Balducci and Eyler. However, the defendant testified that she was "almost to the door" of her room when she heard the final shot and proceeded immediately to Lewis' room. The defendant's testimony and a sketch of the bedrooms showed that the door of the defendant's room was immediately adjacent to the door of Lewis' room. On these facts, it is not reasonable to conclude that an intruder shot Lewis and escaped undetected or unobserved through the front door of the house before the defendant opened her door

and entered Lewis' bedroom.

As to the defendant's hypothesis that a third party could have shot Lewis and then hid in the bathroom located off Lewis' bedroom before escaping, the defendant notes that she left the bedroom twice -- once to retrieve the phone from the kitchen and a second time to get a towel from the hallway bathroom thereby providing an opportunity for an intruder to escape undetected. She claims that an intruder could have exited the house on either one of these occasions. Quite simply, there is no evidence that an intruder was in the house.

The evidence of primer residue on the defendant tends to prove that she fired the fatal shots and thereby tends to refute any reasonable hypothesis of innocence. According to the defendant's testimony, she was not present in Lewis' bedroom when the shots were fired and did not handle the gun after she found Lewis. Consequently, she attempts to explain the presence of the primer residue on her face and hands by pointing to DeGaetano's statement on cross-examination that it is possible to come into contact with primer residue by touching another person who has residue on the area touched. However, the most that can be garnered from the 911 tape and the defendant's testimony is that she touched Lewis on his neck to take his pulse, attempted to turn him on his back, and applied a towel to his leg wound. No evidence shows that the defendant touched Lewis' hands, and no evidence proves that Lewis had primer residue on any other part

of his body.  Furthermore, no evidence proves that Detective LesCault did not wash his hands and had primer residue on them when he conducted the gunshot residue test on the defendant. Accordingly, DeGaetano's statement that it is _possible_ to come into contact with gunshot residue by touching another person does not, without more, provide an innocent explanation for the presence of gunshot residue on the defendant's hands and face. The only reasonable explanation for the presence of gunshot residue on the defendant's person that flows from the evidence is that she fired the gun.

Although the defendant told the 911 operator that Lewis committed suicide and indicated the same to Officers Balducci and Eyler at the crime scene, the evidence is conclusive, as the defendant conceded at trial, that Lewis' killing was a homicide. Therefore, the trial judge was entitled to infer that the defendant's initial statements regarding Lewis' shooting were fabrications intended to conceal her guilt.  See _Black_, 222 Va. at 842, 284 S.E.2d at 610; _Rollston v. Commonwealth_, 11 Va. App. 535, 547, 399 S.E.2d 823, 830 (1991).  The trial judge was also entitled to infer from the evidence before him, as well as his own credibility determinations, that the defendant lied to conceal her guilt when she testified that she did not shoot Lewis.  _Speight v. Commonwealth_, 4 Va. App. 83, 88, 354 S.E.2d 95, 98 (1987) (_en_ _banc_).

We hold that the evidence is sufficient, viewed in the light

most favorable to the Commonwealth, to exclude every reasonable hypothesis of innocence and prove beyond a reasonable doubt that the defendant killed Jesse Lewis.  Therefore, we affirm the defendant's convictions.

<u>Affirmed.</u>

Benton, J., dissenting.


"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the accused] is charged."  In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073, 25 L. Ed. 2d 368, 375 (1970).  The Supreme Court of Virginia has consistently held that convictions may not be based upon speculation, surmise, or conjecture.

> It is, of course, a truism of the criminal law that evidence is not sufficient to support a conviction if it engenders only a suspicion or even a probability of guilt. Conviction cannot rest upon conjecture.  The evidence must be such that it excludes every reasonable hypothesis of innocence.

Smith v. Commonwealth, 192 Va. 453, 461, 65 S.E.2d 528, 533 (1951).  See also Hyde v. Commonwealth, 217 Va. 950, 955, 234 S.E.2d 74, 78 (1977).

Where the Commonwealth relies upon circumstantial evidence to prove guilt, that circumstantial evidence must be "wholly inconsistent with the innocence of [the] defendant."  Foster v. Commonwealth, 209 Va. 326, 330, 163 S.E.2d 601, 604 (1968).  In other words, "[w]here inferences are relied upon to establish [a factual element of the offense], they must point to [that fact] so clearly that any other conclusion would be inconsistent therewith."  Dotson v. Commonwealth, 171 Va. 514, 518, 199 S.E. 471, 473 (1938)(citation omitted).  Thus, "'[c]ircumstances of suspicion, no matter how grave or strong, are not proof of guilt

- 9 -

sufficient to support a [guilty] verdict . . . beyond a reasonable doubt.'" <u>Powers v. Commonwealth</u>, 182 Va. 669, 676, 30 S.E.2d 22, 25 (1944).

Upon its assumption that no other explanation is rational, the majority concludes that the evidence proved that Mary Frances Warwick shot and killed Jesse Lewis. The evidence in the record clearly reveals, however, that the Commonwealth's evidence did not exclude alternate, reasonable theories of Lewis' death. Therefore, I dissent.

In upholding the verdict that Warwick was guilty of homicide, the majority makes much of Warwick's initial statement to the dispatcher that Lewis attempted to commit suicide. However, the evidence proved that Warwick had a valid reason to believe that Lewis shot himself. The evidence proved that Warwick and Lewis met in 1993 "at the Round Table which was a group of elderly people that met at the Methodist Church to socialize." At that time, Lewis was seventy-one, living alone, and very lonely. Warwick was sixty-three and also lonely. They became friends and began to spend time together. They walked together in the mall with other elderly people, walked through the woods at Iron Gate Park, and often watched the airplanes at Chesterfield Airport.

During this time, Warwick lived in her own home with her son, who abused alcohol and verbally abused her. Sometime after Warwick and Lewis became friends and had spent significant time

- 10 -

together, Lewis invited her to move into his residence and to occupy one of his two unused bedrooms.  Between Thanksgiving and Christmas of 1993, she moved into his house.  Because she had "moral misgivings" about living with Lewis while they were unmarried, Warwick consulted with a family counsellor.  The counsellor testified that Warwick "felt that might have compromised her morally, and she wanted some reassurance about that."  Warwick and Lewis had separate bedrooms in Lewis' house.

Prior to his death, Lewis learned that his daughter, who lived in California, would be coming to his house for a visit. In anticipation of this visit, Warwick moved into a bedroom with a single bed nearer to Lewis' bedroom.  This arrangement would have allowed Lewis' daughter and her husband to have the double bed in Warwick's bedroom.  The evidence proved that Lewis' three children rarely visited him.

Before Valentine's Day of 1994, Lewis gave Warwick an engagement ring, and they made plans to marry once she reached sixty-five, the age at which she would be covered by medicare health insurance.  Sometime after they became engaged, Lewis began experiencing medical problems.  He had numbness in his feet and legs.  He also suffered depression and was taking medication for his depression.  To combat the numbness, Lewis tried to walk more often because the walking "helped, but toward the end, he said [walking] didn't help."  He often expressed fears about becoming disabled and "said he'd rather be dead than be a

cripple."  Warwick consulted with the family counsellor about Lewis' depression and suggested to Lewis that he see the counsellor or his doctor.

On June 3, Lewis took Warwick shopping to buy a blouse for an upcoming church social.  When they walked in the mall, Lewis "was very slow" and "said he did not feel good."  "[O]n the way back home," Lewis said to Warwick, "I have no feeling in my feet whatsoever. . . .  I can't even . . . feel to touch the brake."  Later that evening, they watched television and played card games.  At ten o'clock, after Warwick went to her bedroom, Lewis "stopped by the door [to her bedroom], and he said, 'I love you,' and he went to bed."

In her statements to the police and in her testimony at trial, Warwick consistently described the events on the morning of June 4.  While asleep in bed, she was awakened at approximately 6:00 a.m. by "a pow . . . and then . . . heard another pow," and she sat up in bed.  When she heard a third shot, she was almost at the door to her bedroom.  She entered Lewis' room and saw him partially sitting and partially lying at the foot of his bed on the floor.  She saw blood covering his leg, "put [her] hand on his neck, and he moaned, and [she] couldn't feel a pulse."  She saw lots of "blood running down his leg and his arm and there was blood all over everywhere."  She also noticed a gun on the floor near his hand.

Warwick left the room, went into the kitchen, and called 911

on a portable telephone.  In the recorded telephone conversations, Warwick told the dispatcher that Lewis apparently had tried to kill himself by shooting his leg, and she said Lewis had been depressed.  When the dispatcher asked if Lewis was conscious and breathing, Warwick replied, "Wait a minute.  Yes, he's conscious."  She also said he was breathing.  Warwick asked for quick assistance and indicated she had a heart condition and was in great distress.  In response to the dispatcher's instructions, Warwick checked Lewis' breathing again, said he was breathing and awake, but "won't talk."

The 911 dispatcher instructed Warwick to get a towel and to move Lewis.  Warwick placed a towel on Lewis' leg wound.  Warwick told the dispatcher that she had attempted to move Lewis but he was too heavy.  The dispatcher asked if Lewis was shot any other place.  Warwick said she did not know because she could not move or turn him.  When she told the dispatcher that Lewis was still moving, the dispatcher asked her to try to get Lewis on his back.  She then told the dispatcher that Lewis' "blood [was] all over the floor" and "his arm and his legs [were] covered in blood."  The dispatcher encouraged Warwick to stop crying and screaming and instructed Warwick to "just push him on the shoulders" to lay Lewis on his back.  The dispatcher told Warwick again to check his breathing.  Warwick did so and also told the dispatcher the gun was on the floor and that she had not touched it.

The recording of Warwick's 911 telephone call confirms much

of Warwick's description of Lewis and establishes that Warwick was under extreme stress when speaking with the 911 dispatcher. Warwick was confused and concerned that she was "going to have a heart attack." She described the events as "an ugly nightmare" and was crying during the telephone call. Warwick initially reported that Lewis was breathing and when asked to check his chest movement, became distressed and reported, "I think he is dead. Oh, God." Because of the way that Lewis was slumped against the bed, Warwick could not see the wound to the back of Lewis' head. Moreover, the autopsy report indicates that the bullet that entered the back of Lewis' head travelled downward and did not exit the front of his body. Thus, Warwick had no reason to know of the head wound.

In summary, the evidence proved that Warwick discovered Lewis on the floor with a leg wound and a gun nearby. It was early in the morning; she had been awakened by the gunshots; and she had no reason, apparent on the record, to believe he had been shot by an intruder. She knew that as late as the previous evening Lewis had been very depressed because of his poor health. Based on these circumstances, the evidence established a reasonable basis for Warwick's assumption that Lewis shot himself.

Despite the strong evidence in this record that Lewis may have shot himself, Warwick's counsel "concede[d]" during an argument at trial on the question of admissibility of certain

evidence that Lewis' death was a homicide.  In convicting

Warwick, the trial judge also ruled that "[a]ny theories of this

case that suggest suicide or death as the . . . result of an

intruder or third party proved to be implausible."  Despite that

concession by counsel and the trial judge's ruling, the evidence

did not prove beyond a reasonable doubt that Warwick killed

Lewis.

> The Assistant Chief Medical Examiner testified as follows:
>     Mr. Lewis had five gunshot wounds.  One of
>     those was to the back of his head.  Two were
>     to his upper back.  He had an abnormal
>     curvature of his spine so that he had a bit
>     of a hunch back, and he had two superficial
>     wounds that passed through that area in his
>     upper back.  He also had a graze wound to his
>     left forearm, and he had a gunshot wound
>     which passed through his left upper leg.
>
>     The gunshot wound to his head caused a
>     small amount of tearing and some bruising on
>     his brain and could be considered a
>     potentially lethal wound, but in my view the
>     clearly lethal injury in this case was the
>     gunshot wound to his leg which went through a
>     major artery in that leg.

The medical examiner further testified that the back wound and

the head wound were caused by bullets travelling "from the

direction of the head of the deceased toward his feet."  In

describing the cause of the head wound, he said, "as [the bullet]

traveled downward [in the head], the concussion from the passage

of the bullet, the energy from the passage of the bullet caused a

superficial injury to the underlying brain."  He stated that the

leg wound could have been the lethal wound because it caused a

severe loss of blood through the severed artery.  Neither the medical examiner's testimony nor any of the Commonwealth's evidence excluded the hypothesis that all of the wounds were self-inflicted, with the head wound being the last one.

The evidence proved that both of Lewis' hands contained barium antimonium or lead molecules, described as gunshot residue.  The majority summarily dismisses the reasonable hypothesis that when Warwick touched Lewis she received traces of the residue from that contact.  Contrary to the majority's view, the evidence proved that during the 911 telephone call Warwick had significant and extended contact with Lewis when she checked his breathing, used a towel to cover his wound, and attempted to move him onto his back.  Indeed, Warwick tried to stop the bleeding by putting a towel on the leg wound.  She also testified, "I never touched the gun.  I did try to get Jesse over.  That's the nearest I got to the gun."  Consistent with her testimony, her fingerprints were not on the gun.

Moreover, a forensic scientist testified as follows:

Q    What would be the ways in which an individual would get primer residue on those parts of the hand that you described or the fleshy areas of the face?

A    An individual could get primer residue on their hands or face if they either fire a weapon or if they handle a dirty weapon or if they're in the close proximity to the discharge of a weapon.

Q    I'm going to show you the Commonwealth's exhibit, the gunshot residue kits from both the defendant, Ms. Warwick, and Mr. Lewis. I'm going to ask you if you have seen those

– 16 –

before and had occasion to conduct investigations on those two pieces of evidence.

A     Yes.  I recognize the unique forensic science number that was assigned to this case and my initials on the top of each one of these gunshot residue kits and also my initials at the bottom of these kits where I sealed them after analysis with evidence tape.

Q     Can you tell the Court please what the results of your analysis of the kit concerning the defendant, Ms. Warwick, was?

A     Yes.  I was able to identify a single particle of primer residue, Mrs. Warwick's left hand and on her face.  I also found particles that were indicative of primer residue on her right hand and left hand.

When I say indicative of primer residue, that means instead of a particle that contains all three elements, lead, barium and antimonium, I found particles that contain two of those elements, in this case lead and antimonium.

<u>I can't identify that material [on Warwick] as being definitely from the primer. It could be from the primer.  It's indicative of primer residue, but bullet lead also contains antimony, for example, so it may be that those particles originated from the bullet rather than the primer</u>.

Q     Did you have occasion to conduct a similar examination on the gunshot residue kit of Mr. Lewis?

A     Yes, I did.

Q     Can you indicate what your results were?

A     I was able to identify primer residue on both the right and left hand from Mr. Lewis.

Q     Now, you've indicated I think that there are certain specific ways in which the residue is deposited on the fleshy areas of

the skin, the hands, the face and so forth of an individual or an object; is that correct?

A    Yes.

Q    Does the size of the particles that you found deposited on the hand and the face of Ms. Warwick indicate to you that the collection of that was consistent with one of the three ways which you indicated to the Court?

A    Yes, it does.

Q    Did you have occasion to examine the size of the particles insofar as Mr. Lewis was concerned?

A    I did record the size of the particles that were found on Mr. Lewis' hand, yes.

Q    Did you draw any conclusion about whether or not he would have had to have collected in one of the ways you described as well or whether there were other options available for him?

A    <u>The primer residue found on Mr. Lewis' hands would be consistent with having been deposited there by one of the methods that I have already I described.</u>

(Emphasis added).


Furthermore, the forensic scientist testified that residue can be transferred by one person touching another who has residue on his person.  Indeed, he described the following precautions that police are trained to take to avoid that occurrence:

Q    And you don't know if Detective LesCault gave Ms. Warwick an opportunity to wash her hands; do you?  And you don't know if she actually washed her hands, as you've just described to the Court is supposed to be done?

A    Actually the subject to be sampled should not wash their hands.  It's the

officer that is suppose to wash his hands. Since most officers carry weapons, you want to make sure that there isn't a potential for contamination for the subject about to be sampled. So, I'm assuming in this case that [Warwick] did not wash her hands, but as I say, I was not at the scene.

Q     So, you do not know if the officer washed her hands as he's supposed to; do you?

A     I do not know.

Q     And you said that you make sure that the officer does this so that the sample is not contaminated. How can the sample be contaminated?

A     There is a potential of contamination if an individual has primer residue on his hands and he is sampling an individual's hands. Some of that primer residue, it's possible that during the sampling procedure some of the primer residue could fall off one individual's hand and land on another's and thereby be picked up by the sampling devices.

Consistent with his testimony that the police may contaminate a person from their prior handling of a weapon, the forensic scientist described how Warwick may have gathered residue on her.

Q     Let me ask you in the converse of what [the prosecutor] asked you. Let's assume that [Warwick] did not wash [her] hands, the officer did not wash her hands, and she actually touched someone that had primer residue on them. She could have then got primer residue on her hands; couldn't she?

A     If the individual that she touched had primer residue on the individual's skin in the area that she touched, it is possible to transfer that residue from one individual to another in the manner you are suggesting, yes.

– 19 –

This evidence conclusively establishes that the residue can be transferred from person to person and that Warwick had an extended opportunity to be exposed to the residue as she tried to assist Lewis after he was wounded.[2] She may have even touched some of the four spent cartridges found on the floor. That Warwick did not testify to touching Lewis' hand is not material. The uncontradicted evidence proved that the dispatcher's instructions required her to have significant contact with Lewis as she sought to help him. Moreover, Warwick was "hysterical and crying" when talking to the dispatcher and the responding officers. Ordinary human experience suggests that her failure to recall every discrete movement she made was not unreasonable.[3]

---

[2]That residue may be transferred in this manner is a scientific fact and is not speculative.

> Firearm discharge residues are present at a shooting scene and on the fired weapon and spent cartridges. They are easily transferred by contact and, therefore, it is possible that touching the hands of a person who has recently fired a weapon, handling a fired weapon, removing a fired cartridge, and similar acts could leave residues on a person's hand, although he himself has not fired a weapon. However, it is found that these acts usually contaminate both hands, thereby giving point counts of greater than 5 for each hand.

Edward J. Imwinkelried, Scientific and Expert Evidence, 297 (2d. ed. 1981).

[3]Significantly, however, Warwick knew that she did not touch the gun that she saw on the floor next to Lewis. During intense interrogation in which the police officers lied to her about the facts and threatened her with life imprisonment, Warwick consistently denied shooting Lewis or touching the gun. Confirming her consistent statements to the police and testimony

To bolster the speculative nature of its case, the Commonwealth sought to prove that no other person could have entered the house. Even that proof was based on conjecture because, contrary to the Commonwealth's assertion, no evidence proved that the door to the residence was locked. Warwick told the dispatcher that the door was unlocked. The dispatcher, however, instructed Warwick to go to the door and told Warwick that the police would not enter until she went outside. Consistent with the dispatcher's statement, the police officer testified that he was in the driveway and "had been there a couple of moments" when Warwick came to the door in her pajamas. The police officer did not approach the house until Warwick came to the door, "motioned[,] and yelled for [the officer] . . . to come in." The reasonable conclusion to draw from this evidence is, not that the door was locked, but that for safety reasons the police officer wanted to see Warwick outside the residence before he entered.

Furthermore, even if the door was locked, no evidence proved that the door would not have locked when closed by a person exiting the house. Additionally, one of Warwick's witnesses testified that several months after the offense, he found a key to the front door, marked "F. Door," outside the residence.

(..continued)
that she did not touch the gun, none of her fingerprints were found on the gun. Moreover, the Commonwealth never explained the inconsistency between the lack of Warwick's fingerprints on the gun and its theory that the residue found on her hands occurred from firing the gun.

- 21 -

Considering all of the evidence, the Commonwealth did not prove beyond a reasonable doubt that Warwick murdered her friend, Lewis. By no means did the physical evidence prove Warwick's guilt beyond a reasonable doubt. The Commonwealth's case rests on mere speculation, not proof, that a third individual was not in the house that morning; therefore, by a process of exclusion, the majority concludes that Warwick must have killed Lewis. However, no evidence proved that Warwick fired the gun. Furthermore, the Commonwealth did not prove that the house was secure from third parties. Simply put, the evidence does not "point to [Warwick's] guilt so clearly that any other conclusion would be inconsistent therewith." Dotson, 171 Va. at 518, 199 S.E. at 473.

In addition to the recorded conversation on the 911 emergency line, Warwick gave several comprehensive statements to the police in which she explained her conduct when she found Lewis wounded. She denied touching or firing the gun and denied shooting Lewis. Her testimony at trial explained all of the events of that morning. Furthermore, conspicuously absent is any reason or suggestion why Warwick would have shot Lewis. Warwick did not stand to gain financially from the murder. No evidence proved that any disagreement arose between the couple. Although motive is not a necessary element of murder, in view of the circumstances of Lewis' death, the absence of a motive is significant.

Based solely on the presence of particles of residue on her hands and the belief that no third person could have shot Lewis, Warwick was convicted of second degree murder.  That evidence does not rise beyond conjecture, probability, and supposition. Hall v. Commonwealth, 225 Va. 533, 537, 303 S.E.2d 903, 905 (1983).  For all of the reasons stated above, I would reverse the convictions.